Michael D. WEBER; Barbara L. Weber,
Petitioners—Appellants,

v.

COMMISSIONER OF the INTERNAL
REVENUE SERVICE, Respondent—
Appellee.

No. 94–2609.

United States Court of Appeals,
Fourth Circuit.

Argued July 11, 1995.

Decided July 31, 1995.

**ARGUED:** Randolph Luther Worth, Raleigh, NC, for appellants.    Kenneth L. Greene, Tax Div., U.S. Dept. of Justice, Washington, DC, for appellee.  **ON BRIEF:** Samuel W. Witwer, Jr., Brian M. Waldron, Daniel G. Musca, Witwer, Poltrock & Giampietro, Chicago, IL; Mary K. Logan, David A. Ullrich, Evanston, IL, for appellants. Loretta C. Argrett, Asst. Atty. Gen., Gary R. Allen, John A. Dudeck, Jr., Tax Div., U.S. Dept. of Justice, Washington, DC, for appellee.

Before WIDENER and HALL, Circuit Judges, and SPROUSE, Senior Circuit Judge.

Affirmed by published PER CURIAM opinion.  Judge WIDENER wrote a dissenting opinion.

PER CURIAM:

Michael D. and Barbara L. Weber appeal a final order of the Tax Court, which upheld a notice of deficiency issued to them by the Commissioner of Internal Revenue. After considering the briefs and arguments of the parties, we affirm the judgment of the Tax Court for the reasons stated in its memorandum opinion, which we adopt as our own and reproduce in the appendix below. *Weber v. Commissioner of Internal Revenue,* 103 T.C. 378, 1994 WL 461872 (1994).

*AFFIRMED.*

## APPENDIX

[Opinion of the United States Tax
Court in Case No. 14475–91,
filed August 25, 1994]

DAWSON, Judge.

This case was assigned to Special Trial Judge John J. Pajak pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182.  All section references are to the Internal Revenue Code in effect for the year in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

PAJAK, Special Trial Judge:

Respondent determined a deficiency in petitioners' 1988 Federal income tax in the amount of $772.

After a concession the Court must decide whether petitioner Michael D. Weber (petitioner), a United Methodist Minister, was an employee or self-employed in 1988.  The answer will determine whether his expenses constitute deductible business expenses on Schedule C under section 62(a)(1) or are miscellaneous itemized deductions allowed on Schedule A to the extent that they exceed 2 percent of petitioners' adjusted gross income under section 67.

This is the test case for the United Methodist Ministers as to these issues. Petitioners in many of the pending cases have agreed to be bound by the final decision in this case.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners' legal residence was Route 1, Box 208–B, Kittrell, North Carolina, at the time they filed their petition.

Petitioner has been an ordained minister of the United Methodist Church since 1978. The United Methodist Church operates in accordance with the Book of Discipline of the United Methodist Church (1984 ed.) (Discipline). The Discipline sets forth the church laws, plan, polity, and process by which United Methodists are guided. The Discipline also serves as a practical manual that sets forth and explains the standard organization of the conferences, jurisdictions, and mission fields of the United Methodist Church. Every United Methodist Minister must agree to abide by and practice those precepts. Petitioner agreed to follow the Discipline.

The Discipline lists the specific duties that a minister is expected to perform. A minister must preach, read, and teach; prior to a baptism, a minister must instruct the parents and sponsors; a minister must encourage the distribution and use of Methodist literature in the local church; a minister must visit the sick, the aged, and others in need; a minister must perform marriage ceremonies in accordance with the laws of the State and the United Methodist Church; a minister must counsel those experiencing matrimonial difficulties; a minister must console bereaved families and conduct appropriate funeral and memorial services; a minister must lead a congregation to accept the racial and ethnic inclusiveness of the United Methodist Church.

The Discipline states that a "local pastor shall be under the supervision of a district superintendent and a counseling elder who shall supervise the local pastor's work in the ministerial course of study and give counsel on matters of pastoral responsibility." Discipline, *supra* par. 406.4. The Discipline pro-vides that "local pastors shall be amenable to the Annual Conference in the performance of their pastoral duties and shall attend the sessions of the Annual Conference." Discipline, *supra* par. 406.5. The Discipline provides for a mandatory retirement age of 70 for ministers, provides for involuntary retirements, and requires that ministers formally request a leave of absence. The Discipline shows that the United Methodist Church is well organized to accomplish its goals.

The structure of the United Methodist Church consists of a series of "conferences" that have progressively decreasing jurisdictional authority. The conferences include, among others, the General Conference, the Jurisdictional Conferences, and the Annual Conferences.

The General Conference is the highest conference of the United Methodist Church. It is a collegial body of ministerial and lay delegates elected from each of the Annual Conferences presided over by Methodist bishops. The General Conference meets every 4 years to discuss and resolve issues of concern to the United Methodists. The General Conference has the authority to amend certain portions of the Discipline. The General Conference also has full legislative power and authority to define the power and duties of the Annual Conference, other conferences at a more local level, and the congregational meetings.

The United States is divided into five Jurisdictional Conferences. One of the primary responsibilities of these conferences is to elect the bishops.

The Annual Conferences are composed of ministerial and lay members. A bishop presides over each Annual Conference. The Annual Conferences are the basic ruling bodies of the United Methodist Church, the basic jural units, the primary organizations, and the legal units in the life of the church. The Discipline recommends that each Annual Conference be incorporated, whenever practicable. The record does not indicate whether in 1988 the North Carolina Annual Conference was incorporated.

A minister is accountable to an Annual Conference. Each Annual Conference has

the authority to decide all matters that relate to the character and conference relations of the ministers within its jurisdiction. An Annual Conference can impose requirements on ministers in addition to those of the Discipline. The clergy members of the executive session of an Annual Conference have the authority to discipline and fire a minister.

The Annual Conference has the power to hear complaints against its clergy members, and may try, reprove, suspend, deprive of ministerial office and credentials, and expel or acquit any against whom charges have been proffered. The Annual Conference has the power to administratively locate a ministerial member for unacceptability or inefficiency, subject to rights of appeal. (Administrative location means that a minister can no longer be permitted to itinerate. The minister may also lose salary and benefits.) The Annual Conference credentials ministers and requires continuing education for the ministers. The Annual Conference limits the amount of time a minister may take for vacation to 1 month each year.

The portion of the Discipline on the Annual Conferences demonstrates that the Annual Conferences have significant control over ministers.

The United Methodist Church uses an itinerant system for assignment of the ministers within the church. The itinerant system is defined as:

> the accepted method of The United Methodist Church by which ordained ministers are appointed by the bishop to fields of labor. All ordained ministers shall accept and abide by these appointments. * * * 1. Full-time service shall be the norm for ministry in the Annual Conference. Full-time service shall mean that the person's entire vocational time is devoted to the work of ministry in the field of labor to which one is appointed by the bishop.

Discipline, *supra* par. 436.2.

Ministers of the United Methodist Church are assigned by the bishops to the local churches. A bishop may seek the advice of the cabinet, a group of district superintendents appointed by the bishop, about wheth-er a particular minister should be appointed to a particular local church. A bishop has the ultimate authority to require a minister to serve at a particular local church. A minister ultimately cannot refuse to accept an appointment. One example was given of a pastor who refused an appointment and was told that unless he voluntarily took a leave of absence, he would be put on involuntary leave.

If a minister does not perform appropriately, the bishop has the authority to ensure that the minister is properly supervised and counseled as to his behavior. A minister must have the approval of a bishop to transfer into an Annual Conference.

District superintendents oversee the ministers and the local churches. The Discipline specifies that the supervision responsibilities of the district superintendent are as follows:

> *Supervision.*—1. To work with pastors, Pastor–Parish Relations Committees * * * in formulating statements of purpose for congregations in fulfilling their mission, in clarifying the pastors' priorities in accomplishing these purposes, and being available to them for counsel.
>
> 2. To establish a clearly understood process of supervision for clergy of the district, including observation of all aspects of ministry, direct evaluation, and feedback to the clergy involved.

Discipline, *supra* par. 520.

Ministers are well-educated, trained professionals who ordinarily do not require day-to-day supervision. A minister must meet periodically with the appropriate district superintendent to discuss the minister's ministry and local church. Ministers are required to submit periodic reports to the district superintendents. Ministers must report financial difficulties of the local church to the district superintendent. Ministers are evaluated annually by the district superintendents and the Pastor–Parish Relations Committees of the local churches. The Pastor–Parish Relations Committees deal with problems that the members of the congregation may have with the minister and any problems the minister may encounter.

Every minister who is a member of an Annual Conference has the right to a ministerial appointment and to be paid an equitable salary. Each Annual Conference has an Equitable Salary Commission that determines the minimum salaries of the ministers and provides a supplement to any local churches which cannot meet the minimum salary level. If a local church opening is not available, the Annual Conference provides for the payment of a minister's salary. The Annual Conference may establish a "sustentation fund" for the purpose of providing emergency aid to ministers in the conference who may be in special need.

Ministers may seek and receive leaves of absence from the Board of Ordained Ministry. Ministers may also become eligible to receive maternity or paternity leave and disability leave. Ministers, spouses, and dependents are covered by a life insurance plan funded by the local church. Ministers are also covered by a death benefit plan which is based on denominational average compensation throughout the United States. In the North Carolina Conference, the minister paid 1 percent and the local church paid 3.1 percent of plan compensation.

The General Board of Pensions of the United Methodist Church maintains a pension plan that provides payments to the ministers upon retirement. Petitioner participated in the United Methodist Church pension plan. Each local church made payments on behalf of petitioner to the United Methodist Church's pension plan. Ministers are expected to make voluntary contributions to the pension plan equal to 3 percent of their salary.

Petitioner had been a member of the Kansas–East Annual Conference. Petitioner had to obtain permission from a bishop in the North Carolina Annual Conference to transfer into that conference. In 1981, he moved from the Kansas–East Annual Conference to the North Carolina Annual Conference. Petitioner is likely to remain a minister affiliated with the North Carolina Annual Conference for his entire professional life.

Petitioner served as the minister for the Concord United Methodist Church in Graham, North Carolina, from 1986 to 1988. In September 1988, petitioner was appointed by Bishop Carlton P. Minnick, Jr., Bishop of the North Carolina Annual Conference, to serve as the minister of the Plank Chapel United Methodist Church in Kittrell, North Carolina, for the remainder of 1988. The North Carolina Annual Conference granted petitioner a $600 moving expense allowance for his move from Graham, North Carolina, to Kittrell, North Carolina. The Concord United Methodist Church and the Plank Chapel United Methodist Church are in the North Carolina Annual Conference. Petitioner worked full time at each of these local churches during each assignment.

Petitioner and his family lived in the parsonage provided by each local church he served in 1988. Each local church paid petitioner a salary on a monthly basis. Petitioner continued to receive his salary while on vacation. Each local church gave petitioner a utility expense allowance and a travel expense allowance. Each local church paid part of the cost of petitioner's life insurance. Each local church paid 75 percent of petitioner's health insurance premiums for the North Carolina Annual Conference self-insured health insurance plan administered by Blue Cross and Blue Shield. Petitioner paid the remaining 25 percent of the health insurance premium. The North Carolina Annual Conference determined these percentages.

Upon invitation, petitioner could preach in a church other than the one to which he was assigned. Petitioner could not establish his own church. A minister does not have the authority to unilaterally discontinue the regular services of a local church. Petitioner was required to explain the position of the Discipline on any topic he chose to present in his sermons. Petitioner also was permitted to give his personal views on a topic as long as he explained the position of the United Methodist Church. Petitioner followed the United Methodist theology in his sermons.

Petitioner was obligated to meet with the Pastor–Parish Relations Committee four times a year. Petitioner talked with his district superintendent approximately eight

times in 1988. The North Carolina Annual Conference requested that ministers take 9 hours of continuing education classes over a 4-year period. In accordance with that request, petitioner participated in continuing education classes to improve his skills as a minister.

Each local church for which petitioner worked provided the church building and office in which he gave his sermons and performed some of his duties. The local churches bought religious materials for his ministry. Petitioner purchased his own vestments. The vestments were not required by the local churches nor were they necessary for petitioner to perform his duties. At the time of trial, petitioner wore vestments at one of the churches where he worked and a suit and tie at the other church. Petitioner also acquired his own library, which he utilized in his ministry.

Petitioner had the responsibility to prepare a church bulletin. The local church provided office space in which he could prepare the bulletin. Petitioner purchased a computer and used it at home for church work and to prepare the bulletin. Although neither local church employed any office staff to assist in the preparation of the bulletin, if any clerical workers were employed, they would be employees of the local church rather than of petitioner.

For 1988, petitioners reported all income and expenses attributable to petitioner's ministry on Schedule C of their Federal income tax return. Petitioner reported total gross income of $19,246.93 on his Schedule C from the two churches for which he worked. This included salaries of $16,106.60, parsonage utility expense allowances of $190.33 (the amount by which the allowances exceeded his expenses for utilities), travel expense allowances of $2,200, earnings from weddings and funerals of $150, and a moving expense allowance of $600. Petitioner claimed a total of $5,146.20 as business expenses on his Schedule C. Petitioner Barbara L. Weber, a professor, had $1,278.56 of State income taxes withheld from her wages, as shown on her Form W-2 attached to petitioners' 1988 Federal income tax return.

Petitioner did not report as income any portion of the health insurance premiums which were paid on his behalf by the local churches in 1988.

Respondent determined that petitioner was an employee rather than self-employed in 1988. Accordingly, respondent disallowed all of the deductions petitioners claimed on Schedule C of their 1988 Federal income tax return. The parties stipulated that if we hold that petitioner was an employee, petitioners will be allowed to deduct the amounts in issue as miscellaneous itemized deductions on Schedule A, subject to the 2-percent limitation under section 67.

## ULTIMATE FINDING OF FACT

Petitioner, a United Methodist Minister, is an employee for Federal income tax purposes.

## OPINION

Petitioner's basic position appears to be that because he is a minister in a unique religious order he cannot be an employee. While we have great respect for petitioner's religious dedication, religion is not the question before us.

Petitioner is seeking a business benefit. He wants to file a Schedule C, Profit or Loss From Business, and to claim business expenses on it. It is he who has cast this case in business terms.

Respondent has determined that petitioner is not entitled to deduct business expenses on Schedule C. It is petitioner's burden to prove that respondent's determination is not correct. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

We must decide whether petitioner correctly reported his business expenses as a self-employed individual on Schedule C. To be properly reported on Schedule C, a taxpayer's expenses must come from a trade or business of his own, other than that of being an employee.

The term "employee" is not defined in the Internal Revenue Code for purposes of the income tax issue in this case. Although a minister who is an employee may apply to be

exempt from self-employment tax under section 1402(c) and (e), there is no comparable statutory provision for income tax purposes.

Whether the employer-employee relationship exists in a particular situation is a factual question. *Air Terminal Cab, Inc. v. United States,* 478 F.2d 575, 578 (8th Cir.1973); *Professional & Executive Leasing, Inc. v. Commissioner,* 89 T.C. 225, 232, 1987 WL 43879 (1987), affd. 862 F.2d 751 (9th Cir. 1988). Common law rules are applied to determine whether an individual is an employee. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322–323, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992); *Simpson v. Commissioner,* 64 T.C. 974, 984, 1975 WL 3150 (1975).

Section 31.3401(c)–1(b), Employment Tax Regs., defines the employer/employee relationship as follows:

(b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he [or she] has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he [or she] is not an employee.

Courts consider various factors to determine an employment relationship between the parties. Relevant factors include: (1) The degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the opportunity of the individual for profit or loss; (4) whether or not the principal has the right to discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believe they are creating. *Professional & Executive Leasing, Inc. v. Commissioner, supra* at 232; *Simpson v. Commissioner, supra* at 984–985. No one factor dictates the outcome. Rather, we must look at all the facts and circumstances of each case. *Azad v. United States,* 388 F.2d 74, 76 (8th Cir.1968); *Professional & Executive Leasing, Inc. v. Commissioner, supra* at 232; *Simpson v. Commissioner, supra* at 985; *Gamal–Eldin v. Commissioner,* T.C.Memo. 1988–150, 1988 WL 31438, affd. without published opinion 876 F.2d 896 (9th Cir.1989).

The "right-to-control" test is the crucial test to determine the nature of a working relationship. *Matthews v. Commissioner,* 92 T.C. 351, 361, 1989 WL 11483 (1989), affd. 907 F.2d 1173 (D.C.Cir.1990). The degree of control is one of great importance, though not exclusive. *Atlantic Coast Life Ins. Co. v. United States,* 76 F.Supp. 627, 630 (E.D.S.C. 1948). Accordingly, we must examine not only the control exercised by an alleged employer, but also the degree to which an the (sic) alleged employer may intervene to impose control. *Radio City Music Hall Corp. v. United States,* 135 F.2d 715, 717 (2d Cir. 1943); *deTorres v. Commissioner,* T.C.Memo. 1993–161, 1993 WL 114453. In order for an employer to retain the requisite control over the details of an employee's work, the employer need not stand over the employee and direct every move made by that employee. *Professional & Executive Leasing, Inc. v. Commissioner, supra* at 234; *Simpson v. Commissioner, supra* at 985; *Gierek v. Commissioner,* T.C.Memo. 1993–642, 1993 WL 540748; *Atlantic Coast Life Ins. Co. v. United States, supra* at 630. Also, the degree of control necessary to find employee status varies according to the nature of the services provided. *Reece v. Com-*

*missioner,* T.C.Memo. 1992–335, 1992 WL 126062; *Pulver v. Commissioner,* T.C.Memo. 1982–437, 1982 WL 10729.

The threshold level of control necessary to find employee status is generally lower when applied to professional services than when applied to nonprofessional services. *Azad v. United States, supra* at 77; *James v. Commissioner,* 25 T.C. 1296, 1301, 1956 WL 835 (1956); *Reece v. Commissioner, supra; Herman v. Commissioner,* T.C.Memo. 1986–590, 1986 WL 21801. In *James v. Commissioner, supra* at 1301, this Court stated that "despite this absence of direct control over the manner in which professional men [and women] shall conduct their professional activities, it cannot be doubted that many professional men [and women] are employees." Also, in *Azad v. United States, supra* at 77, the Court of Appeals for the Eighth Circuit said that "From the very nature of the services rendered by * * * professionals, it would be wholly unrealistic to suggest that an employer should undertake the task of controlling the manner in which the professional conducts his activities." Generally a lower level of control applies to professionals. Petitioner is a professional minister.

Petitioner contends that no one had the right to control either the method or the means by which he conducted his ministry. We do not agree. Bishop Joseph H. Yeakel testified that the church is "very proactive" and none of its members work without supervision. As a minister of the United Methodist Church, petitioner was required to perform the numerous duties set forth in the Discipline. He agreed to perform those duties. He had to explain the position of the Discipline on any topic he chose to present in his sermons. Petitioner admitted that he followed the United Methodist theology in his sermons. Further, petitioner does not have the authority to unilaterally discontinue the regular services of a local church.

Under the itinerant system of the United Methodist Church, petitioner was appointed by the bishop to the positions he held. A bishop of the North Carolina Annual Conference determined where petitioner would preach, and petitioner had no right ultimately to refuse the appointment. Reverend Kermit L. Braswell testified that upon invitation a pastor could preach in a church other than the one to which he was assigned. Petitioner could not establish his own church.

Petitioner was bound by the rules stated in the Discipline regarding mandatory retirement at age 70 and involuntary retirement. He was required to obtain the approval of the relevant bishop before he transferred from one Annual Conference to another. The Annual Conference limits the amount of leave he could take during a year.

Petitioner was required by the Discipline to be "amenable" to the Annual Conference in the performance of his duties in the position to which he was appointed. Webster's Third New International Dictionary (1981) defines "amenable" as "1a: liable to be brought to account or judgment: liable to the legal authority of: ANSWERABLE, ACCOUNTABLE * * * b: liable to a claim or charge * * * 2a: capable of submission (as to a judgment or test) * * * b: readily brought to yield or submit: RESPONSIVE, TRACTABLE * * * syn see OBEDIENT, RESPONSIBLE". The requirement that petitioner be amenable to the Annual Conference is another indication of the control the Annual Conference had over petitioner.

Petitioner asserts that he was not an employee because he scheduled his own activities from day to day and took vacation days without obtaining prior approval. Petitioner's ability to schedule his activities according to his own desire merely demonstrates that less supervision is necessary in connection with a professional. If petitioner had not performed his duties satisfactorily, he would have been subject to censure. A minister is subject to censure for, among other acts, failure to perform the work of the ministry and disobedience to the Discipline.

Bishop Carlton P. Minnick, Jr., testified that ineffectiveness or unfitness ultimately may result in the termination of a minister's membership in the Annual Conference or in administrative location. A minister may be subject to termination from membership in the Annual Conference for the use of materials that do not conform to the United Methodist faith. Furthermore, one of the district

superintendent's responsibilities is to establish a clearly understood process of supervision for clergy.

Normally the control factor is the most persuasive factor in determining whether an employment relationship exists. We are mindful, however, that where professional individuals are involved this control "must necessarily be more tenuous and general than the control over nonprofessional employees." *James v. Commissioner, supra* at 1301; *Gamal–Eldin v. Commissioner,* T.C.Memo. 1988–150, affd. without published opinion 876 F.2d 896 (9th Cir.1989). Nevertheless, it is clear that petitioner is subject to significant control.

We now turn to the other factors relevant to determine petitioner's employment status as a minister. Petitioner was not required to invest in the work facilities. The local churches provided him with a home. The local churches provided the church in which petitioner gave his sermons, and which contained office space for performing his duties. The local churches bought religious materials for his ministry. Petitioner argued that he used his own computer for church work and to prepare the weekly church bulletin at home. His choice to work at home does not negate the fact that the local churches provided him with an office. Petitioner purchased computer equipment to make his work easier and to perform better. It does not prove that he was required to provide office equipment.

Petitioner also pointed to the fact that he purchased his own vestments. Vestments were not required by the local churches, nor were they necessary for him to perform his duties. Petitioner's choice was merely his own preference. Petitioner also acquired his own library over the years, as many professionals do, whether they are employees or independent contractors.

In *Juliard v. Commissioner,* T.C.Memo. 1991–230, 1991 WL 84170, this Court held that, because the taxpayer earned a salary and was reimbursed for expenses, he was not in a position to increase his profit by his own actions, and he was not at risk for loss.

Petitioner was paid a salary, and provided with a parsonage, a utility expense allowance, and a travel expense allowance from each local church. Furthermore, if petitioner was not assigned to a local church, the Annual Conference would pay him a minimum guaranteed salary, or if he were in special need, the Annual Conference could give him sustentation. Aside from minimal amounts earned for weddings and funerals and amounts spent on utilities and travel, petitioner was not in a position to increase his profit, nor was he at risk for loss.

The Annual Conference had the right to try, reprove, suspend, deprive of ministerial office and credentials, expel or acquit, or locate petitioner for unacceptability or inefficiency. The clergy members of the executive session of the Annual Conference had the authority to discipline and fire petitioner. These are other strong factors indicating that petitioner was an employee rather than an independent contractor.

We find that petitioner's work is an integral part of the United Methodist Church. A minister has the responsibility to lead a local church in conformance with the beliefs of the United Methodist Church, to give an account of his or her pastoral ministries to the Annual Conference according to prescribed forms, and to act as the administrative officer for that church. That the minister is essential to the mission of the United Methodist Church was confirmed by Bishop Joseph H. Yeakel, who testified as *follows in* response to questions from respondent:

Q. Isn't it true that in order to accomplish the mission of the United Methodist Church, the United Methodist Church must depend on the connectional structure of the church, such as its various boards, commissions, agencies, conferences, local churches, bishops, ministers, and lay leaders?

A. We have chosen to be a connectional church, so that none of our organizational structure are lone rangers to the life of the church. So, yes, it is true that we have chosen to respond. We believe that this is a faithful response to the Gospel. There are other ways to structure, but this is our way.

Q. But in the connectional structure of the United Methodist Church, would you agree the local church plays an integral role in furthering the mission of the United Methodist Church?

A. Absolutely.

Q. And with respect to the pastor of the local church, would you also agree that to further the local church's integral role in the mission of the United Methodist Church, the pastor must perform his or her responsibilities and duties in conformance with this mission in mind?

A. Yes, sir.

We also find that the relationship between petitioner and the United Methodist Church was intended to be permanent as opposed to transitory. Petitioner has been an ordained United Methodist minister since 1978. Petitioner has conceded on brief that he is likely to remain a minister for his entire professional religious career, and that he is likely to remain affiliated with the North Carolina Annual Conference. The Annual Conference will pay a salary to a minister even when there are no positions with a local church available. The fact that ministers are also provided with retirement benefits indicates that the parties anticipate a long-term relationship. An independent contractor would not normally receive such benefits from a customer or client.

Petitioner does not make his services available to the general public, as would an independent contractor. See *Jacobs v. Commissioner*, T.C.Memo. 1993–570, 1993 WL 495594; *Casety v. Commissioner*, T.C.Memo. 1993–410, 1993 WL 335775; *Gamal–Eldin v. Commissioner, supra.* Petitioner works at the local church by the year and not for individuals "by the job." See *James v. Commissioner*, 25 T.C. at 1300.

There are some factors that may tend to suggest that petitioner was an independent contractor rather than an employee. For example, petitioner could not be fired at will. Ministers such as petitioner generally do not need day-to-day supervision. Petitioner purchased his own vestments and library which he used in his ministry. He has the right to explain his personal beliefs to his congregation in addition to the position of the Discipline and the United Methodist Church.

Because there was no withholding of income taxes and no Form W–2, we assume that petitioner and his supervisors believed that ministers such as petitioner were independent contractors. We give this factor little weight.

This case is distinguishable from cases where the courts determined that taxpayers were independent contractors. In *Simpson v. Commissioner*, 64 T.C. 974, 985, 1975 WL 3150 (1975), the taxpayer was free to work throughout the State, and was not required to attend meetings. In contrast, petitioner was required to work at the church to which he was assigned, and was required to attend meetings.

In *Azad v. United States*, 388 F.2d at 77–78, the taxpayer was not restricted to performing services solely for one party; he performed services for several parties; no supervision was exercised over the professional performance of his work; he was not required to account for absences from his work; and he was not required to comply with any set policies, rules, or regulations of the party. Fringe benefits which normally accrued to other employees were not provided to the taxpayer. In contrast, petitioner was to perform services to the local church to which the bishop appointed him, supervision and control could be exercised over the professional performance of his work, and he was required to comply with the Discipline. Petitioner was also provided with fringe benefits which normally are provided to employees.

Bishop Jack M. Tuell testified that there are some similarities between the powers possessed by the Annual Conference and bar associations. (Bishop Tuell practiced law for 2 years before his call into the ministry.) The similarities noted by Bishop Tuell include credentialing, providing continuing education, and disbarment or termination of membership. However, there are some benefits provided by the Annual Conference which are not provided by any bar association of which we are aware. These benefits include a guaranteed minimum salary, salary

even when not assigned to a local church, moving allowances, and sustentation pay.

Petitioner received many benefits that we find are typical of those provided to employees rather than independent contractors, some of which follow. Each local church made contributions on behalf of petitioner to a pension plan. Petitioner continued to receive his salary while on vacation. If needed, petitioner would have been entitled to disability leave and paternity leave. If he could not be assigned to a local church, he would receive a guaranteed salary from the Annual Conference. If he were needy, he might be able to get sustentation from the Annual Conference. A portion of the cost of petitioner's life insurance was paid by the local churches. The local churches paid a portion of the death benefit plan premiums, and petitioner paid a portion. The local churches paid 75 percent of petitioner's 1988 health insurance premiums. Although respondent noted that petitioner did not include as compensation the value of the health insurance premiums paid by the local churches under section 61(a)(1), this is moot because petitioner as an employee is entitled to an exclusion for this income under section 106.

These enumerated benefits also indicate that petitioner is an employee rather than self-employed.

After considering all the facts and circumstances present in this case, we conclude that the factors that indicate petitioner was an employee outweigh those factors that indicate that he was self-employed. Accordingly, we hold that petitioner's ordinary and necessary trade or business expenses paid in 1988 were not properly listed on Schedule C, but are allowable as miscellaneous itemized deductions on Schedule A, subject to the 2-percent floor. Petitioners are also allowed to deduct the $1,278.56 of withheld State income taxes as an itemized deduction on their 1988 Schedule A.

The parties have stipulated that the only issue in dispute is whether petitioner was an employee or was self-employed. We need not decide which part of the United Methodist Church is the employer. See *Herman v. Commissioner*, T.C.Memo. 1986–590, 1986 WL 21801.

Petitioner contends that an employee-employer relationship cannot exist because there is no entity which exercised sufficient control over petitioner so that he may be classified as an employee. He claims that the control over a minister is deliberately spread in a way that ensures that the minister has the maximum freedom to be the man or woman of God, which the United Methodist Church believes the ministry is all about. We do not question this polity for religious purposes. However, we disagree with petitioner's contention when we analyze this case by application of the relevant court decisions and regulations. We acknowledge that an important religious purpose is served by the organizational structure. Nonetheless, we find that there is sufficient control over petitioner as well as several other factors which establish that he was an employee.[1]

To reflect our conclusions herein,

*Decision will be entered under Rule 155.*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

The majority adopts the opinion of the Tax Court, finding Weber to be an employee of the United Methodist Church for federal income tax purposes, but does not justify the different result reached by the Tax Court, on the same day it decided the instant case, in concluding that a Pentecostal pastor with Methodist roots, he having attended both Emory University and Emory and Henry College,[*] was an independent contractor, entitled to deduct his trade and business expenses in full. See *Robert A. Shelley*, RIA T.C.Memo 94,432, at 94–2300, 1994 WL 461840 (1994), *appeal pending*, No. 95–2731 (11th Cir.1995). I do not agree that there is justification, and I would therefore reverse the Tax Court's decision on the ground of inconsistency.

---

**1.** We recognize that there may be differences with respect to ministers in other churches or denominations, and the particular facts and circumstances must be considered in each case.

[*] John Emory was a Methodist bishop from Maryland who died in 1835. The Henry is Patrick Henry, the brother of Madame Russell, a notable Methodist lay worker of that era.

Both Weber and Shelley were paid a salary by their local churches, see, e.g., op. at 1108, 1109; *Shelley,* T.C.Memo at 2304, as to which ministers are clearly independent contractors, because a minister's local congregation is the ultimate consumer of his services. Moreover, the Internal Revenue Code treats all ordained ministers as self-employed for purposes of Social Security tax collection. See 26 U.S.C. §§ 3121(b)(8), 1402(c)(4), (e); *Olsen v. Commissioner of Internal Revenue,* 709 F.2d 278 (4th Cir.1983); 26 C.F.R. § 1.1402(c)–5(a)(2), (b). After reviewing the facts of the two cases, I cannot find any other material, permissible consideration that distinguishes Weber from Shelley sufficient to justify the differential tax treatments imposed by the Tax Court in these two cases.

The *Shelley* court referred to the Tax Court's decision in *Weber* as "shar[ing] certain similarities with the instant case," but concluded nonetheless that the International Pentecostal Holiness Church "did not have the same type of relationship with [Shelley] that the United Methodist Church does with its ministers." *Shelley,* T.C.Memo at 2307–08. Having reviewed the facts of both cases, I believe that the differences between Shelley's relationship to the Pentecostal Church and Weber's relationship to the United Methodist Church are either immaterial or are based on impermissible doctrinal considerations, or both.

The critical issue in this case is the level of control over the conduct of ministers exercised by the Methodist Church. See op. at 1112. To a large extent, the facts relied upon by the Tax Court to support its finding of control are elements of religious doctrine as set out in the Book of Discipline of the United Methodist Church, see op. at 1105–06, 1107–08, which is a doctrinal authority generally establishing the laws, policies, and precepts of the Church. Thus, the Book of Discipline is guided by religious conviction and religious law, not by employment relationships, and its strictures should be considered impermissible or immaterial in determining the employment status of a religious minister. In other words, the fact that Weber was answerable in numerous ways to the Annual Conference or others as set out in the Book of Discipline does not reflect an employment relationship any more than does his belief that he is answerable to God.

Moreover, many of the facts relied upon by the Tax Court in this case are immaterial or minimally probative of his employment status, and are in any event impossible to distinguish from those involved in Shelley's case sufficiently to justify a different outcome. For example, that Weber was ultimately guaranteed a salary by the Annual Conference, op. at 1108, is hardly relevant in the light of the fact that his salary was actually paid by his local congregation. The fact that Weber could be disciplined, relocated, or terminated by the Annual Conference, see op. at 1107, is substantially a question of religious doctrine rather than employment status, see *supra;* and, in any event, it is materially indistinguishable from the constraints imposed upon Shelley, who could be decertified and placed on probation by the Sonshine Conference for failure to comply with the International Pentecostal Holiness Church Manual, a work similar in authority and purpose to the Book of Discipline. See *Shelley,* T.C.Memo at 2303. Finally, various benefits provided to Weber by the United Methodist Church, see op. at 1108–09, are at best minimally relevant to Weber's employment status with the United Methodist Church in the light of the ultimate fact that he was paid and provided benefits by his local congregation. Once again, moreover, the benefits provided to Weber are hardly distinguishable from those available to Shelley, who the Tax Court found to be an independent contractor. See *Shelley,* T.C.Memo at 2304.

Because the tax code treats all ordained religious ministers as self-employed for Social Security tax collection purposes, because Weber was paid by his local congregation, and because no material facts sufficiently distinguish Weber's case from Shelley's, I would hold the Tax Court to its own most recent decision in *Shelley* and reverse the finding that Weber is an employee for income tax purposes.