T.C. Memo. 2016-5

UNITED STATES TAX COURT

JORGE QUINTANILLA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13556-12.                    Filed January 7, 2016.

Jorge Quintanilla, pro se.

<u>Thomas T. Thomas</u>, <u>James A. Nelson</u>, <u>Catherine G. Chang</u>, and <u>Paulmikell</u>

<u>A. Fabian</u>, for respondent.

MEMORANDUM OPINION AND FINDINGS OF FACT

HOLMES, <u>Judge</u>: Jorge Quintanilla grossed more than $84,000 in 2009

and almost $90,000 in 2010 as an exceptionally skilled production worker on

approximately 150 commercials shot in Southern California. He earned this

money both in his own name and through his corporation, and he says that he

[*2] earned it as an independent contractor, not as an employee. The Commissioner disagrees.

OPINION

There are only two issues that the parties fought about in this case, and the law is settled for each.

The big issue is whether Quintanilla correctly reported his business expenses on Schedule C (the schedule that people who are in business for themselves use to report their expenses) and not on Schedule A (the schedule that people who work for somebody else use to report business expenses). The distinction matters because the Code limits Schedule A deductions more than it limits Schedule C deductions. The most important of these limits is the 2% rule: An employee who incurs unreimbursed business expenses may deduct them only as miscellaneous itemized deductions and only to the extent that they exceed 2% of his adjusted gross income. Secs. 62(a)(2), 63(a), (d), 67(a) and (b), 162(a).[1] Other Code sections, e.g., section 68, may limit these deductions even more. And then there's the dreaded alternative minimum tax, which can be triggered by certain Schedule A deductions.

---

[1] Section references are to the Internal Revenue Code, as amended and in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]   Independent contractors and self-employed persons report business deductions on Schedule C.  See Chapman v. Apfel, 236 F.3d 480, 486 (9th Cir. 2000);  Weber v. Commissioner, 103 T.C. 378, 386 (1994), aff'd, 60 F.3d 1104 (4th Cir. 1995).  The Code burdens these people in different ways, but in his particular circumstances Quintanilla would be better off if he were one of them and not someone else's employee.  And he makes three arguments for why he is an independent contractor and not the employee of the various production companies that he worked for.  He claims first that he reported as an independent contractor in 2008 and nothing changed over the next two years.  He claims that he passes the multifactor test built up by cases to distinguish common-law employees from independent contractors.  And he claims that he was a statutory employee--a person who may be a common-law independent contractor but whom the Code treats as if he were an employee for some purposes while still allowing him to deduct business expenses on Schedule C.  See sec. 3121(d)(3)(D); Rosato v. Commissioner, T.C. Memo. 2010-39.

We don't have to spend much time on the first argument.

Each tax year stands alone, and the Commissioner may challenge in a later year what he permitted in an earlier one.  Auto. Club of Mich. v. Commissioner, 353 U.S. 180 (1957); Rose v. Commissioner, 55 T.C. 28, 32 (1970).  The

**[*4]** Commissioner's failure to challenge Quintanilla's status for the 2008 tax year doesn't disable him from challenging that status for 2009 and 2010.

The legal distinction between an independent contractor and a common-law employee is also settled as a general matter, though it's often murky in application. We'll start with the easy part:  An independent contractor is one who works for another but according to his own manner and method, free from direction or right of direction in matters relating to performance of work save as to results.  See Prof'l & Exec. Leasing, Inc. v. Commissioner, 89 T.C. 225, 232-33 (1987), aff'd, 862 F.2d 751, 753 (9th Cir. 1988); Simpson v. Commissioner, 64 T.C. 974, 985 (1975); see also Ill. Tri-Seal Prods., Inc. v United States, 353 F.2d 216 (Ct. Cl. 1965).

We have over the years built up a list of factors that we look at to decide whether a worker has enough autonomy in his work to be an independent contractor:

- the degree of control exercised by the principal over the worker;

- the worker's investment in his workplace;

- his opportunity to make a profit or suffer a loss;

- whether the principal can fire him;

**[\*5]**   ●   whether the work is part of the principal's regular business;

●   the permanency of his relationship with the principal;

●   the relationship the parties believed they were creating; and

●   the principal's provision of employee benefits.

See Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 270 (2001); Weber, 103 T.C. at 387; Prof'l & Exec. Leasing, 89 T.C. at 232; Simpson, 64 T.C. at 984-85; Cole v. Commissioner, T.C. Memo. 2006-44.  Courts don't weigh the factors equally, and consider their significance differently depending on the particular facts of a case.  Weber, 103 T.C. at 387; Simpson, 64 T.C. at 985; Gamal-Eldin v. Commissioner, T.C. Memo. 1988-150, aff'd, 876 F.2d 896 (9th Cir. 1989).

A secondary issue is whether Quintanilla owes a penalty.  The law here is easy to state as well:  Section 6662 imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax that is attributable to the taxpayer's negligence or to his disregard of rules or regulations.  Sec. 6662(a) and (b)(1).  A taxpayer can escape the penalty if he shows that he had reasonable cause for the underpayment and acted in good faith.  Sec. 6664(c)(1).  Whether a taxpayer acted with reasonable cause and in good faith is a facts-and-circumstances decision, and the most important fact is the extent of the taxpayer's effort to assess his proper

**[*6]** tax liability in light of his knowledge and experience. Sec. 1.6664-4(b)(1), Income Tax Regs.

FINDINGS OF FACT

Quintanilla timely filed his income tax returns for the 2009 and 2010 tax years. The Commissioner determined that Quintanilla had a deficiency of more than $11,000 for 2009, and $15,000 for 2010. He also tacked on an accuracy-related penalty for both years. Quintanilla, a California resident, timely filed a petition challenging these determinations.

Quintanilla owned a company named Pre Call Studios, Inc. Pre Call filed a Form 1120, U.S. Corporation Income Tax Return, for 2009. For 2010, Pre Call Studios made an S-corporation election and filed a Form 1120S, U.S. Income Tax Return for an S Corporation. Section 1362 allows a small business corporation to elect treatment as an S corporation for tax purposes.

Both Quintanilla and his accountant credibly testified about their recordkeeping and tax-preparation routine. Quintanilla diligently collected receipts and made notes about his expenses. He then organized them in envelopes by category and handed them over to his mom, who acted as his bookkeeper. Quintanilla or his mom gave the accountant all the documentation that he asked

[*7] for.  Quintanilla also relied on his accountant and had no reason to question his competency.

Quintanilla may not have been very sophisticated in his business bookkeeping, but he was highly skilled in his field, which is production work on advertisements and TV commercials.  In 2009 and 2010 he worked on a number of projects that lasted from one day to over a month for a variety of production companies.  We have no doubt that he possesses unique skills that are valuable to this industry.

His skills don't fit snugly within the industry's usual classifications, and Quintanilla's titles varied from job to job.  They included "driver", "hyphenate driver," and "set dresser."  Each of these titles has a defined meaning in the industry:  A "driver" drives people, props, or other equipment and may or may not provide his own vehicle.  A "hyphenate driver" is a driver who can also do a second job such as build sets or provide other services.  A "set dresser" can build or paint a set, move sets or furniture, or act as a foreman and oversee a crew who do these things.  But the roles on the smaller crews of commercial shoots blur, and Quintanilla's title for a job did not always accurately describe what role he filled.

We find that the production companies that hired Quintanilla hired him to build sets.  They expected him to provide any tools he needed to complete the job.

[*8] Quintanilla has an enormous collection of tools--which he stores in two 40-foot steel containers--that travels with him to jobsites. These containers are also packed with machinery that Quintanilla uses to fabricate pieces of sets on the spot. He described these containers and had photos that showed machinery including power tools, specialty sanders, sledgehammers, welders, a nail gun, and more. Some were quite expensive: He owned a German specialty sander that cost more than $2500, and four welders that cost $3500 each. He also rents some equipment, and his choice to buy or rent is his own.

It's common practice for production companies to hire people they know to work on their projects, but these companies often outsource the paperwork to firms that specialize in back-office chores. In 2009 and 2010 these payroll companies included GEP Commprod Services, LLC, CAPS, Inc., Team Alternatives, Monarch Consulting, and FSI Processing, Inc. Production companies typically use the same handful of payroll companies. Thus, Quintanilla might be paid by the same payroll company for six months, but actually be working on 20 or more projects run by many different production companies.

A key question in contractor-v.-employee cases is "who tells whom to do what?" And in this industry, there's not an easy answer. The production companies describe what they would like the set to look like. They will often send

**[*9]** a sketch and maybe a verbal description. Quintanilla then becomes responsible for making the imagined set a reality. He has some discretion to alter the sketch to make it work. And if a company doesn't give him a sketch, Quintanilla creates a workable sketch himself. He also has authority to hire workers to help him complete the job.

Quintanilla's situation is also complicated by his decision to work sometimes in his own name and sometimes through his corporation. We find that the production companies didn't much care--they were hiring Quintanilla's expertise one way or the other. And we believed Quintanilla when he said it didn't matter to him whether they asked for Pre Call or for Jorge Quintanilla--all the calls went to the same cell phone number. He did say that he felt he had a bit more clout and a bit fewer trust issues when he bargained with a production company as a corporation. But we find that, aside from whom the check was made out to, there was little practical difference between the conditions where Quintanilla worked as himself and those where he worked through his corporation.

There was, however, a difference in the paperwork involved. When a production company hired Quintanilla as an individual, it would generally issue him a Form W-2, Wage and Tax Statement. And the company listed on the Form W-2 as the employer was usually a payroll company. Even a tiny bit of

**[\*10]** questioning showed that his situation is much different from most taxpayers who get a W-2 from their employer, and nobody involved in this case thinks the payroll company had any control whatsoever over how Quintanilla did his work. Indeed, Quintanilla often performed different jobs for different production companies while being paid by the same payroll company.  He was hired for more than 80 different jobs by production companies in 2009, but some of these production companies hired him for multiple jobs at different times throughout the year.  The same was true in 2010.

To show the bookkeeping tangle of these jobs, we list those just from 2009:

| Date | Payee | Production | Payroll Company | Job Title | Hours | Gross Pay |
|---|---|---|---|---|---|---|
| 1/7/09 - 1/15/09 | Jorge Quintanilla | Knucklehead - JC Penney | CAPS, Inc. | Driver | 84.75 | $5,097 |
| 1/27/09- 1/31/09 | Jorge Quintanilla | Digital Kitchen - AAR Big Numbers | Team Alternatives | Set Dresser - Driver | 60 | $2500 |
| 2/4/09- 2/5/09 | Jorge Quintanilla | Park Avenue Teleproductions | N/A | Construction | 24 | $900 |
| 2/8/09- 2/11/-09 | Jorge Quintanilla | Park Avenue Teleproductions | N/A | Construction | 48 | $1800 |
| 3/14/09- 3/16/09 | George Quintanilla | Epoch Films - Minute Maid | CAPS, Inc. | Driver | 30 | $1200 |
| 3/14/09- 3/16/09 | George Quintanilla | Epoch Films - Minute Maid | CAPS, Inc. | Driver Kit Rental | | $75 |

| [*11] 4/09/09 | Pre Call Studio Rentals | Chelsea Pictures | GEP Admin. Services | Driver | 30 | $1650 |
|---|---|---|---|---|---|---|
| 4/15/09 | Pre Call Studio Rentals | Chelsea Pictures | GEP Admin. Services | Driver | 10 | $550 |
| 4/15/09 | Jorge Quintanilla | Smuggler - USPS | CAPS, Inc. | Hyphenate Driver | 10 | $450 |
| 4/14/09 - 4/23/09 | Jorge Quintanilla | Epoch Films - Wells Fargo | CAPS, Inc. | Driver | 80 | $3,800 |
| Check Date 4/21/09 | Pre Call Studio Rentals | Chelsea Pictures | GEP Admin. Services | Rent TNT | 0 | $100 |
| 5/28/09- 5/29/09 | Jorge Quintanilla | Smuggler - Domino's | CAPS, Inc. | Driver | 31 | $1841 |
| 6/16/09- 6/22/09 | Jorge Quintanilla | Savant Film - Purina | CAPS, Inc. | Hyphenate Driver | 53 | $2508 |
| 6/28/09 | Jorge Quintanilla | Imperial Woodpecker - NFL | CAPS, Inc. | Driver | 8 | $475 |
| 6/22/09- 6/25/09 | Jorge Quintanilla | Smuggler - Best Buy | CAPS, Inc. | Driver | 49 | $3164 |
| 6/29/09- 7/1/09 | Jorge Quintanilla | Smuggler - Best Buy | CAPS, Inc. | Hyphenate Driver | 24.5 | $1432 |
| 7/13/09- 7/17/09 | Jorge Quintanilla | Anonymous Content -- Cadillac | CAPS, Inc. | Driver | 61.75 | $3565 |
| 7/19/09- 7/30/09 | Jorge Quintanilla | Anonymous Content -- Cadillac | CAPS, Inc. | Hyphenate 5- Ton | 113.75 | $7,102 |
| 7/31/09 | Jorge Quintanilla | Anonymous Content -- Cadillac | CAPS, Inc. | 5-Ton Truck Driver | 10 | $500 |
| 8/12/09- 8/19/09 | Jorge Quintanilla | Anonymous Content -- Comcast | CAPS, Inc. | Set Dresser | 88 | $5,386 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **[*12]** 9/22/09 | Jorge Quintanilla | Imperial Woodpecker - Budweiser | CAPS, Inc. | Driver | 10 | $500 |
| 9/28/09-10/1/09 | Jorge Quintanilla | HSI/ JC Penney | GEP Admin. Services | Driver | 20 | $1000 |
| 10/05/09-10/12/09 | Jorge Quintanilla | Tool of North America - Wendy's | CAPS, Inc. | Hyphenate Driver | 63 | $3300 |
| 10/27/09-10/30/09 | Jorge Quintanilla | Furlined LLC - Target | CAPS, Inc. | Hyphenate 5-Ton | 53 | $2295 |
| 11/24/09 | Jorge Quintanilla | Smuggler - Gatorade | CAPS, Inc. | Hyphenate Driver | 15 | $953 |
| 12/11/09 | Jorge Quintanilla | Anonymous Content -- AT&T | CAPS, Inc. | Hyphenate 5-Ton | 10 | $500 |
| 12/13/09-12/14/09 | Jorge Quintanilla | Anonymous Content -- AT&T | CAPS, Inc. | Set Dresser | 20 | $1000 |
| 12/15/09-12/17/09 | Jorge Quintanilla | Anonymous Content -- AT&T | CAPS, Inc. | Set Dresser | 30.25 | $1699 |
| 12/18/09-12/19/09 | Jorge Quintanilla | Anonymous Content -- AT&T | CAPS, Inc. | Set Dresser Travel | 16 | $1000 |
| 12/21/09 | Jorge Quintanilla | Anonymous Content -- AT&T | CAPS, Inc. | Driver | 10 | $500 |
| 12/22/09 | Jorge Quintanilla | Anonymous Content -- AT&T | CAPS, Inc. | Set Dresser | 10 | $500 |
| No Date Provided (2009) | Jorge Quintanilla | | FSI Processing, INC | | | $33532 |

**[\*13]** Of the nearly 1100 hours for which Quintanilla provided detailed work logs, he spent 435 as a driver, 332 as a hyphenate driver, 224 as a set dresser, and 72 performing construction. In 2009 he worked only 40 hours through Pre Call, all as a driver. He also earned a bit of income through Pre Call from renting tools and equipment.

We conclude that almost all these facts favor finding that Quintanilla was an independent contractor and not an employee. The most important is that Quintanilla had a large degree of control as to how to accomplish the tasks he had to do throughout the year. A production company sometimes gave Quintanilla a sketch drawn by a set designer. And sometimes it just gave him the director's vision for the project. But in either situation Quintanilla had a large degree of independence in determining how to accomplish the project. He ordered props and modified them to the specs, he had authority to hire additional workers as needed, and he had the authority not to use workers that weren't performing. The Commissioner asserts that since the producers had a vision of the set in mind, the production companies retained a large degree of control over Quintanilla. We disagree--we find that Quintanilla had a large degree of discretion in how to construct the set. He engineered sets from drawings and often told the producers

[*14] that their initial vision needed to be modified. That he was given context for building a set doesn't translate into a lack of control.

Quintanilla also provided all the tools used, and he invested heavily in them. He also bought a number of high-dollar items required for his work. There is no evidence to suggest that the production company supplied tools or a budget to purchase the necessary equipment. The fact that a worker provides his or her own tools or owns a vehicle that is used for his work weighs toward finding him to be an independent contractor. Ewens & Miller, Inc., 117 T.C. at 271.

An opportunity to earn a profit or suffer a loss also distinguishes an independent contractor from an employee. Simpson, 64 T.C. at 988; Rosato v. Commissioner, T.C. Memo. 2010-39. The Commissioner argues that the real potential for profit or loss lies with the firms hired to plan marketing campaigns, and with the production companies that the advertising firms hire to shoot commercials and ads. And we agree that the players at these levels have the potential to make greater profits or suffer greater losses. But even in the production of commercials, Hollywood is a pioneer of the gig economy. Production workers like Quintanilla have some real risk of profit or loss. Quintanilla could accept or decline projects (and on occasion could submit a bid). At times a production company would give a fixed fee for Quintanilla's services.

[*15] He credibly testified that he would prepare a budget to see if he could perform the work for that amount.

Production companies did sometimes hire Quintanilla subject to hourly union scale rates, which are set by collective bargaining. But on other projects he would set his own rate depending on the job at hand. While some companies paid rent for the use of his tools, some refused, and he would increase his hourly rate to compensate for their use. Some companies paid invoices that Quintanilla prepared based on his estimates, while others paid on the basis of hours he billed and reported to them. But on all these we find that he controlled which projects he worked on and whether to accept the amounts he was offered.

We also find that the production companies had the right to fire Quintanilla. But there's a bit of a qualification here--that right would very seldom be exercised. As Quintanilla credibly explained, because of the short-term nature of the jobs, if a production company or client were dissatisfied with someone's work that person would rarely be fired;[2] he would instead just never get another phone call to work for that particular production company or client.

---

[2] See Beth A. Bechky, "Gaffers, Gofers, and Grips: Role-Based Coordination in Temporary Organizations," 17 Org. Sci., 9 (2006) (noting that the film people don't get fired due to the duration of projects and because often the productions need the tools they provide.)

**[\*16]** Our cases tell us that work that is part of the principal's regular business indicates employee status. Simpson, 64 T.C. at 989; Rosato v. Commissioner, T.C. Memo. 2010-39. But it's a little bit hard to figure out exactly who is the "principal" on a commercial shoot. If it's an advertising agency, its "regular" business might be to promote the products of its clients, and maybe not to produce commercials. If the "principal" is a production company, its business might be said to be the production of commercials, but not always set design and construction. We think the arguments could go both ways on this factor, and find it neutral.

Another factor is the permanency of a working relationship--the more permanent the relationship, the likelier it shows an employer-employee relationship. Ewens & Miller, Inc., 117 T.C. at 273, Rosemann v. Commissioner, T.C. Memo. 2009-185. The Commissioner asserts that Quintanilla was employed by GEP Commprod Services LLC, CAPS, Inc., Park Avenue Teleproductions, Team Alternatives, Monarch Consulting, and FSI Processing, Inc. Quintanilla credibly testified at trial, however, that GEP and CAPS are payroll companies used by several different production companies. Multiple production companies may use the same payroll company, and thus the wages are totaled for the year. See generally Cencast Servs., L.P. v. United States, 729 F.3d 1352, 1362 (Fed. Cir.

**[*17]** 2013).  For instance, Quintanilla was paid through CAPS for about six months, but that was for over 20 independent projects.[3]  A review of invoices submitted by the payroll companies shows that the payroll company name was at the top of the invoice, the production company was listed below along with a client code that identified the project, and then the wages were described.  While some production companies, such as Biscuit or Arrow Films, hired him several times in a single year, it was always for separate ad campaigns--for example, Nike, Starbucks, GMC--and often months apart.

The longest commercial shoot that Quintanilla worked on was about one month, but most are shorter.  During the years at issue he worked on 80-100 jobs per year.  That the jobs were so short-term also suggests that Quintanilla was an independent contractor rather than an employee.

Throughout the years at issue Quintanilla had relationships with many production companies and two unions.  The relationships with production

---

[3] If two or more related corporations employ the same individual, one of the corporations can serve as the common paymaster for all of the related corporations.  See sec. 31.3121(s)-1, Employment Tax Regs.  This allows the group of companies to be treated as a single employer, which prevents them from having to pay more in total Social Security and Medicare taxes than a single employer would have to pay.  Id.  In this instance, however, Hollywood is again different.  The corporations that paid Quintanilla are not related, but many of them use the same third-party payroll company.

**[*18]** companies appear to have been transitory and task-focused.[4] Neither party intended to make a permanent or employer-employee relationship.

So far, then, the usual factors don't help the Commissioner much. But he has one very strong argument left: Quintanilla is a union member, and many of his jobs were priced at rates set through collectively bargained contracts. Union contracts typically provide that workers are employees and not independent contractors. See generally Kraus v. Commissioner, T.C. Memo. 2003-10. Quintanilla credibly explained that he and many of his peers in the industry join unions mainly to obtain health insurance and to a lesser extent to appear on call boards. His experience was typical--he was a member of a union and received his health insurance from it. That union required Quintanilla to show a minimum number of hours to receive this insurance. But neither the union contracts nor the production companies gave him vacation days or sick time. As Quintanilla

---

[4] Somewhere there is probably an economist who's formulated the equation for defining when the overhead costs saved exceed the transaction costs incurred for an industry like this, but sociologists have noticed this peculiarity of economic life in Hollywood: "When systems of activity are assembled anew, substantial control of fixed overhead can be achieved through short-term contracting. Ties are also developed between entrepreneurs and film studios on a per-picture basis." Robert R. Faulkner & Andy B. Anderson, "Short-Term Projects and Emergent Careers: Evidence from Hollywood", 92 Am. J. of Soc. 879, 889 (1987). As Faulkner and Anderson imply, however, these transaction costs can be kept down with the predictability of individuals performing the same roles from job to job. Id. at 890.

**[*19]** credibly explained, if he wanted a vacation he would just not answer his phone. And the union contracts even excluded fixed wages and working conditions from their coverage--they expressly reserved the power of employees to cut better deals if they could. Quintanilla testified that all of his jobs came from personal connections and not one came from a union call board.[5] See Susan Christopherson & Michael Storper, "The Effects of Flexible Specialization on Industrial Politics and the Labor Market: The Motion Picture Industry," 42 Indus. & Lab. Rel. Rev. 331, 335 (1989) (describing the roster system as an intermediary labor market for temporary employment in relation to craft jobs.) At times he was paid union rates, but at other times he negotiated his fee.

Quintanilla credibly testified that everything in Hollywood is a negotiation, and contracts are discussed daily. At times a studio even uses another studio's stage if the price is lower than the rate for its own stage. Continual negotiations and ever-changing contracts are evidence that the studios didn't intend to make a permanent relationship. Employers don't negotiate with their employees daily.[6]

---

[5] "Temporary organizations contrast with traditional hierarchical organizations as they are governed through networks of relationships." Beth A. Bechky, supra n. 2, at 3.

[6] Coase, R. H., "The Nature of the Firm", 4 Economica New Series, 391 (1937).

[*20] After reviewing the factors, we find that Quintanilla is an independent contractor. It follows that he appropriately deducted items on his Schedule C.[7] With our ruling in his favor on the merits, the penalty also disappears.[8]

Decision will be entered

under Rule 155.

---

[7] As for Quintanilla's final argument, it is possible to be a statutory employee if one is a common-law independent contractor. But he doesn't fit any of the categories of statutory employees listed in sec. 3121(d)(3), and it doesn't matter because independent contractors and statutory employees can both deduct business expenses on Schedule C instead of Schedule A. Rosato v. Commissioner, T.C. Memo. 2010-39.

[8] There is a small issue for which this isn't true--whether Quintanilla had to pay tax on the state income-tax refunds he received in 2009 and 2010. The law is black letter on this one: He must include refunds of state income taxes that he deducted in a previous tax year. See Francisco v. Commissioner, 119 T.C. 317, 334 (2002), aff'd, 370 F.3d 1228 (D.C. Cir. 2004); Kadunc v. Commissioner, T.C. Memo. 1997-92. Because he received a Form 1099-G, Certain Government Payments, for each year at issue, we find him liable for the deficiency and associated penalties attributable to his failure to include these refunds on his returns. He didn't contest this issue, and negligence is strongly indicated when a taxpayer doesn't report income for which he gets a 1099. Sec. 1.6662-3(b)(1)(i), Income Tax Regs.; see also Vezey v. United States, 191 F.3d 462 (9th Cir. 1999); Bachmann v. Commissioner, T.C. Memo 2009-51; sec. 1.6664-4(b)(1), Income Tax Regs.