T.C. Memo. 1996-531

UNITED STATES TAX COURT

RICHARD G. AND ANNE C. GREENE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5293-95.                    Filed December 2, 1996.

<u>Frank Sommerville</u>, for petitioners.

<u>Sheri Wilcox</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ARMEN, <u>Special Trial Judge</u>:  This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182.[1]

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1992 in the amount of $998.

The sole issue for decision is whether petitioner Richard G. Greene, an Assemblies of God missionary, was an employee or an independent contractor in 1992. The answer will determine whether his expenses constitute deductible business expenses on Schedule C under section 62(a)(1), or are miscellaneous itemized deductions allowable on Schedule A under section 67 to the extent that they exceed 2 percent of petitioners' adjusted gross income.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. Petitioners are husband and wife and resided in Bangladesh at the time that their petition was filed with the Court.[2]

1. General Background

Petitioner Richard G. Greene (petitioner) was licensed and ordained as a minister of the National Assemblies of God Church (the National Church) in May 1987 and May 1989, respectively. Petitioner pastored an Assemblies of God church in Leesville, Louisiana, at least from the time he became licensed until December 1990, at which time he resigned as a pastor in order to pursue a career as a missionary. During 1992, petitioner performed services as an Assemblies of God missionary.

_____

[2] Pursuant to sec. 7482(b)(2), the parties stipulated that the venue for purposes of an appeal from this decision will be the U.S. Court of Appeals for the District of Columbia Circuit.

The National Church is a nonprofit corporation headquartered in Springfield, Missouri. The National Church operates in accordance with the Constitution and Bylaws of the General Council of the Assemblies of God (Constitution and Bylaws). The Constitution and Bylaws explain the National Church's internal laws, structural organization, polity, and guiding policies. These laws and policies are administered at the national level through the General Council and its various agencies. The General Council, which consists of a body of ordained ministers and delegates of the affiliated local churches, is charged with preserving and promoting established positions on the faith and practice of the National Church. It meets biannually to conduct the general business of the National Church and determine the services that it will provide.

The laws and policies of the National Church are administered at the district level through District Councils. The United States is divided into 55 geographical District Councils, which serve as the connecting link between the affiliated local churches and the General Council. Local churches apply for affiliation at the district level. Each District Council, which is subordinate to the General Council, consists of ordained ministers, licensed ministers, and delegates from the local churches within the district. The District Councils supervise all of the National Church's activities within their prescribed field. The District Councils examine, approve,

and recommend candidates who qualify as certified, licensed, and ordained ministers.[3]  Final approval and issuance of ministerial credentials, however, is made by the General Council's credentials committee (the credentials committee).[4]  Petitioner met all of the requirements set forth by the National Church, and as indicated, is a licensed and ordained Assemblies of God minister.

Individuals holding ministerial credentials are amenable to both the District Council and the General Council in matters of doctrine and conduct.  Causes for the discipline of a minister include:  (1) Any moral failure involving sexual misconduct; (2) any moral or ethical failure not involving sexual misconduct; (3) general inefficiency in the ministry; (4) a failure to represent the Pentecostal testimony correctly; (5) a contentious or

---

[3] The bylaws of the National Church provide qualifications for ministerial licensing and ordination.  The bylaws provide, inter alia, that in order to be licensed as a minister an applicant must: (1) Have a thorough understanding of and be in agreement with the National Church's doctrinal position as contained in the Statement of Fundamental Truths; (2) have an active loyalty to the National Church's constitutional agreements, a cooperative spirit, and a readiness to seek and receive the counsel of older brethren; (3) demonstrate religious knowledge acquired through education or experience by passing a standard test; and (4) be interviewed and recommended by a district credentials committee.
Licensed ministers must meet additional requirements in order to be ordained.  For example, a licensed minister must complete 2 consecutive years of full-time preaching ministry, pass at least one written test, and submit to additional interviews.

[4] According to the constitution and bylaws, the credentials committee consists of the Executive Presbytery.

noncooperative spirit; (6) an assumption of dictatorial authority over a church; (7) an arbitrary rejection of district counseling; (8) a declared open change of doctrinal views; (9) habitual debt that harms the church's reputation; and (10) a marriage in violation of the church's stand on marriage and divorce. The Credentials Committee has final authority in matters of doctrine and the personal conduct of all ministers, including the power to withdraw the approval and recommend the recall of ministerial credentials.

## 2. Missionary Service

The National Church, as one of its stated missions, seeks to promote and encourage world evangelization. Towards this end, the National Church created the Division of Foreign Missions (the DFM), an unincorporated agency, to coordinate foreign missionary efforts. The DFM is supervised by the Foreign Missions Board, and together they select, endorse, establish requirements, and uphold standards for missionaries.

### a. The Endorsement Process

The process of becoming an endorsed missionary is lengthy and is handled primarily at the national level by the DFM and the Foreign Missions Board. An individual applying for a missionary position must submit an application, along with an autobiography, character references, and transcripts to the DFM. The applicant must obtain formal approval from his or her appropriate district before the DFM will begin to process the application. After an

applicant has obtained district approval and completed the application, the DFM evaluates the application. At some point during evaluation, a DFM representative conducts a home-interview with the candidate. Finally, if all indications are favorable, the DFM asks the candidate to travel to Springfield, Missouri, for additional orientation, tests, and interviews. The applicant's geographical foreign field location is defined in the final interview. If the tests and interviews are satisfactory, the DFM will recommend the candidate to the Foreign Missions Board for endorsement.

    b.   <u>The Missionary's 5-year Cycle</u>

The National Church and the missionary candidates consider missionary service to be a lifetime career. Missionary service, however, is generally divided into repeating 5-year cycles. Missionaries spend the first year in the cycle, frequently referred to as the year of "deputational ministry", itinerating local Assemblies of God churches seeking financial support for the foreign mission. They spend the remaining 4 years in the cycle ministering in the foreign field. At the conclusion of the fourth year in the foreign field, missionaries return to the United States and begin another year of deputational ministry, thus initiating a new 5-year cycle.

The DFM provides no formal training with respect to deputational ministry. Generally, missionaries solicit funds from churches and individual donors through pledges that

demonstrate the donor's commitment to support the missionary on a monthly basis. The donor can pledge to support a missionary for life, one 5-year cycle, or less; however, if support is limited to one 5-year cycle or less, the missionary must visit the donor during the next phase of deputational ministry in order to renew the financial commitment. If a donor fails to provide the pledged support, the DFM will not send a past due notice to or make any other contact with the donor; rather, the individual missionary is responsible for contacting the donor and re-establishing the financial support. Deputational missionaries may, at their own expense, hire individuals to assist them in their fund-raising efforts.

The DFM provides donors with a receipt verifying the amount of the pledge and certifying that the DFM, as an agency of the National Church, is a tax-exempt organization. Contributions made to and receipted by DFM are not personally owned by the missionary, even though they may be designated for that missionary's ministry. Rather, the DFM owns the funds raised by the missionaries and maintains administrative control of such funds. The DFM deposits contributions into an individual account maintained for each missionary.

Missionaries must raise sufficient funds to support their foreign ministry before the DFM will "clear" them for departure to their foreign field. In this regard, the DFM prepares a proposed budget for endorsed missionaries to use as a guideline

in determining the amount of funding necessary to support their foreign ministry needs.  Deputational missionaries, however, are not required to comply with the exact figures in the budget so long as they obtain adequate funding for their ministry.

Deputational missionaries are required to file with the DFM monthly "deputational reports" that detail the offerings received and the expenses incurred by the missionary.  Along with the deputational report, missionaries forward the net cash offerings and receipts verifying the offerings and expenses.  Additionally, during their deputational ministry, missionaries prepare a field budget approximating the amount of mission-related expenses they will incur in the foreign field.  Once a missionary departs for the foreign field, the DFM advances funds to the missionary from his or her DFM missionary account to cover the anticipated mission expenses.  Missionaries in the foreign field are required to file quarterly field reports with the DFM explaining how the budget advances were spent.

During both deputational and foreign field ministry, the DFM records the reported expenses and the pledges received on behalf of the missionaries and mails monthly disbursement statements to each missionary detailing the missionaries' total pledged support and expenses.

Missionaries are free to resign at any time.  However, missionaries are not entitled to the balance of their DFM account upon resignation.  Rather, a resigning missionary may reallocate

the funds in his or her foreign ministry account to another missionary's ministry.

c.   Compensation and Benefits

Missionaries are paid a monthly living allowance (a personal allowance) from the funds secured by them in their year of deputational ministry.  The DFM sets an upward limit on the personal allowance amount that missionaries may receive from their respective accounts.  The DFM does not guarantee missionaries a minimum level of support.  In fact, missionaries have the power to designate any amount below the limit set by the DFM as their personal allowance.

The DFM maintains an association group health care plan administered by the Christian Fidelity Life Insurance Co. (Christian Fidelity).  The DFM informs missionaries with respect to the plan but does not require them to participate in the plan. The monthly premiums are transferred from each missionary's account with DFM to Christian Fidelity.  The disbursement reports mailed to petitioner in 1992 indicate that petitioner participated in the health insurance plan.

The DFM maintains a group retirement plan called the "Minister's Benefit Association" (MBA) plan.  The MBA plan allows missionaries to defer a portion of their monthly living allowance to the plan for retirement.  The DFM does not require missionaries to participate in the plan.  The disbursement

reports mailed to petitioner in 1992 indicate that petitioner participated in the MBA plan.

The DFM has no official policy with respect to sick leave; however, it does recommend that missionaries limit their vacation days to 30 or fewer per year. Missionaries are not required to report to the DFM either sick leave or vacation days taken. Thus, the DFM does not maintain any records reflecting the days and hours worked by its missionaries. Missionaries continue to receive their personal allowance while on vacation and sick leave.

d. <u>Communication With the DFM</u>

Apart from the monthly deputational and disbursement reports, petitioner and the DFM communicated on an irregular basis during his year of deputational ministry. The DFM did not contact petitioner at all during that year, and petitioner called the DFM only occasionally for information relating to shipping his belongings to Bangladesh. Other than the quarterly field reports and the monthly disbursement reports, there was no regular form of communication between petitioner and the DFM during his foreign field mission work.

The DFM requires missionaries to attend the "School of Missions" during their deputation year of each 5-year cycle. The School of Missions is not for training purposes; rather, it is a "spiritual debriefing" for missionaries and their families that have been exposed to foreign cultures for long periods of time.

This is the only meeting that missionaries are required to attend.

e.    Disciplinary Matters

Disciplinary matters related to missionary status are handled by the DFM.  Causes for disciplinary action with respect to missionary status include, inter alia:  (1) Any conduct unbecoming to a missionary as a representative of Christ and the Assemblies of God; (2) loss of ministerial credentials with the National Church; (3) indiscretions concerning morals; (4) failure to properly manage and report the use of mission funds; (5) a declared open change in doctrinal views or practices, resulting in variance from those of the National Church, or deliberate variance from the values, purposes, or objectives of DFM; and (6) a contentious or noncooperative spirit.

The DFM has no authority to recall a missionary's ministerial credentials.  The most severe form of discipline that the DFM can exercise is to withdraw its endorsement of, and effectively disassociate itself from, a missionary.  In the event that the DFM withdraws an endorsement, the DFM notifies the missionary's district, closes the missionary's account, and returns to the donors any future offerings received on behalf of the missionary.

f.  Unendorsed Missionaries

Ministers may serve as Assemblies of God missionaries without official endorsement from the DFM.  Assemblies of God churches can and do financially support unendorsed Assemblies of God missionaries.  The DFM provides no assistance of any kind to unendorsed missionaries; thus, unendorsed missionaries must personally collect pledges, issue receipts, and maintain financial records with respect to their foreign ministry.

g.  The Missions Manual

The DFM has written and produced a missions manual (the missions manual) containing both general and specific information about foreign ministry.  The DFM provides all endorsed missionaries with a copy of the missions manual.  The missions manual provides information about the structure of the DFM, the endorsement process, deputational ministry, budgeting, personal allowances, disciplinary action, equipment, overseas freight and shipping, health insurance, the pension program, children of missionaries, foreign field housing, and vacation.

Jerry Burgess (Mr. Burgess) is a member of the Foreign Missions Committee that is responsible for establishing foreign mission practices and procedures and for implementing the decisions of the Foreign Missions Board.  Mr. Burgess also worked as the financial comptroller of the DFM for 16 years.  Mr. Burgess testified at trial as follows:

A:    [The missions manual] is a guide.  You know, if
      Reverend Greene needs to know what he should do in
      a certain situation that might relate to a move on
      the field, or how he can best accomplish some part
      of his ministry, a good place for him to go is to
      the missions manual or ask another missionary on
      the field, but essentially, it is a guide and a
      broad set of parameters as to how the cooperative
      relationship should work.

              *    *    *    *    *    *    *

Q:    Are the provisions of this manual enforceable
      against a DFM missionary?

              *    *    *    *    *    *    *

A:         Well, the provisions of the manual relate to
      the activities of missionaries.  Most of those are
      suggestions, anyway, and we don't even intend to
      enforce them.
           Some of the provisions in the manual define
      the cooperative relationship between the
      missionary and the Division of Foreign Missions,
      and if that missionary chooses to be uncooperative
      and to do things that are harmful or detract from
      the work, then the manual spells out our
      prerogative to disassociate ourselves from that
      missionary, and we no longer have an obligation to
      process his finances or to cooperate with him if
      he won't cooperate with us.

Mr. Burgess' testimony, which we accept, also revealed: (1)

Many persons in top management positions of DFM have not read the

missions manual, and (2) the DFM considered missionaries to be

independent contractors, not employees.

The missions manual states that the DFM does not consider

their relationship with missionaries to be one of employer and

employee.

3.   Petitioner's Missionary Experience

In petitioner's final interview in Springfield, Illinois, petitioner identified Bangladesh as the country in which he wished to minister.  The DFM expressed reservations about petitioner's choice, but petitioner made the ultimate decision. Petitioner began itinerating local churches and raised approximately $600 in monthly support before he was officially endorsed in 1992.  Petitioner received a proposed budget from the DFM detailing the amount necessary to sustain 4 years of foreign ministry in Bangladesh; however, petitioner set a fund-raising goal in excess of the amount proposed because he desired to do things not accounted for in the proposed budget.

Petitioner maintained a routine schedule during his deputational ministry.  On Wednesday evenings and Sunday mornings petitioner ministered at Assemblies of God churches raising support for his mission.  The DFM did not require that petitioner adhere to a particular schedule or method of fund-raising in his year of deputational ministry.  In deciding the best way to prepare and present his deputational services on Sundays and Wednesdays, petitioner talked with experienced missionaries and coordinated with the pastor of the church that was hosting him.

Petitioner spent approximately 3 days per week locating and contacting new churches to itinerate and writing thank-you notes to donors.  Petitioner also prepared and distributed a newsletter to encourage donors to contribute towards his ministry.

Occasionally petitioner hired individuals to assist him in producing his newsletter; however, the assistants usually declined payments for their services.

The DFM did not provide petitioner with an office, supplies, support staff, car, or any other equipment to facilitate his work. Petitioner used his personal car to itinerate local churches and used his personal telephone to contact such churches. Petitioner withheld these expenses from the pledges received prior to forwarding the balance to the DFM.

Petitioner began receiving a personal allowance on December 31, 1991, in the amount of $1,125 per month. Petitioner was eligible to receive a monthly allowance before that time; however, he declined to receive his allowance for some time because his wife was working and the family was able to meet its expenses without depleting petitioner's missionary account with the DFM.

Petitioner and his family departed for Bangladesh on March 30, 1993. The DFM did not assign petitioner to work on a particular project in Bangladesh. Petitioner chose to become involved in student ministry development in Bangladesh that involves teaching classes in an Assemblies of God Bible School. Petitioner also coordinates an outreach program where he supervises students that are starting new churches in various villages. Petitioner was not directly supervised or evaluated by anyone from the DFM or elsewhere.

While serving as a missionary, petitioner became aware of widespread drug addiction in Bangladesh. Petitioner has traveled to drug-infested areas in Bangladesh and has visited with many of the drug-addicted individuals. Petitioner's experiences and conversations with the local Bengalis have led petitioner to believe that there is a need for a drug-rehabilitation program in his area. In his next phase of deputational ministry, petitioner plans to raise funds to sponsor such a program. Petitioner has not informed the DFM of his interest in sponsoring a drug-rehabilitation clinic and to the best of his knowledge, the DFM is unaware of his activity in this area.

At the time of trial, petitioner intended to return to the United States in June 1996 to begin his second phase of deputational ministry. Although most missionaries serve 4 years in the foreign field before returning to the United States, petitioner planned to return after approximately 3 years. In making this decision, petitioner considered the needs of his school-aged children and the schedules of other missionaries in his region. Additionally, petitioner was eager to begin soliciting funds necessary to support his drug-rehabilitation program. It appears that the DFM's involvement in planning petitioner's field departure date was minimal and that petitioner decided on his return date independent of the DFM.

Petitioner owns a copy of the missions manual, but he has never actually referred to it in making his missionary decisions;

rather, he has consulted fellow missionaries when he has had questions about missionary activities.

4. Petitioners' Tax Return and the Notice of Deficiency

The National Church issued petitioner Form 1099-MISC. Such Form reflected nonemployee compensation for services rendered and indicated that Federal income tax was not withheld from that compensation. Petitioner reported his missionary-related income and expenses on Schedule C.

Respondent does not challenge the amount of petitioners' claimed business expenses. Rather, in her notice of deficiency, respondent determined that petitioner was an employee rather than an independent contractor in 1992. As a result of this determination, respondent reclassified the expenses claimed by petitioner on his Schedule C as Schedule A expenses deductible only as miscellaneous itemized deductions, subject to the 2-percent limitation under section 67.

ULTIMATE FINDING OF FACT

Petitioner, an endorsed Assemblies of God missionary, was an independent contractor in 1992.

OPINION

Petitioners contend that petitioner was an independent contractor and, as such, was entitled to deduct the full amount of his business expenses on Schedule C pursuant to section 162. Respondent determined that petitioner was an employee during 1992. Petitioners bear the burden of proving that respondent's

determination is not correct. Rule 142(a); <u>Welch v. Helvering</u> 290 U.S. 111, 115 (1933).

Whether an individual is an independent contractor or a common law employee is a question of fact. <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 862 F.2d 751, 753 (9th Cir. 1988), affg. 89 T.C. 225 (1987); <u>Wolfe v. United States</u>, 570 F.2d 278, 281-282 (8th Cir. 1978); <u>Weber v. Commissioner</u>, 103 T.C. 378, 386 (1994).

Among the relevant factors to consider in determining the nature of a work relationship are the following:  (1) The degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the taxpayer's opportunity for profit or loss; (4) the permanency of the relationship; (5) the principal's right of discharge; (6) whether the work performed is an integral part of the principal's business; (7) what relationship the parties believe they are creating; and (8) the provision of benefits typical of those provided to employees. <u>NLRB v. United Ins. Co.</u>, 390 U.S. 254, 258-259 (1968); <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 862 F.2d at 753, 89 T.C. at 232; <u>Weber v. Commissioner</u>, <u>supra</u> at 387; <u>Simpson v. Commissioner</u>, 64 T.C. 974, 984-985 (1975).  No one factor is determinative; rather, all the incidents of the relationship must be weighed and assessed. <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 324 (1992); <u>NLRB v. United Ins. Co.</u>, <u>supra</u> at 258; <u>Azad v. United States</u>, 388

F.2d 74, 76 (8th Cir. 1968); Weber v. Commissioner, 103 T.C. at 387.

A.    Degree of Control

The principal's right to control the manner in which the taxpayer's work is performed is ordinarily the single most important factor in determining whether a common law employment relationship exists.  Azad v. United States, 388 F.2d at 76; Leavell v. Commissioner, 104 T.C. 140, 149 (1995); Weber v. Commissioner, 103 T.C. at 387.  In order for a principal to retain the requisite control over the details of a taxpayer's work, the principal need not stand over the taxpayer and direct every move made by that person.  Weber v. Commissioner, 103 T.C. at 388; Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. at 234; Simpson v. Commissioner, 64 T.C. at 985.  In addition, the degree of control necessary to find employee status varies according to the nature of the services provided.  Weber v. Commissioner, 103 T.C. at 388.  Finally, we must consider not only what actual control is exercised, but also what right of control exists as a practical matter.  Professional & Executive Leasing, Inc. v. Commissioner, 862 F.2d at 754, 89 T.C. at 233-234; Weber v. Commissioner, 103 T.C. at 387-388.

In determining whether an individual is under sufficient direction and control of another to warrant the finding of an employer-employee relationship, the courts often have referred to the regulations promulgated under the employment tax provisions.

<u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 89 T.C. at 231. Under section 31.3401(c)-1(b), Employment Tax Regs., an employer-employee relationship--

> Generally * * * exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.

As a preliminary matter we note that the parties dispute the identity of the principal in applying the control test. Petitioners contend that in analyzing whether petitioner is an employee, only the control exercised by the DFM should be considered. Respondent contends that the DFM is a division of the National Church and that the collective right to control maintained by the DFM and the National Church must be considered.

We agree with respondent on this point. The National Church prosecutes its activities, in part, through general offices such as the DFM. The DFM is merely an extension of the National Church charged with the specific task of coordinating Assemblies of God missionary efforts outside the United States. As an agency of the National Church, the DFM performs this task on behalf of the National Church. Thus, we think that the control exercised by both the National Church and the DFM should be

considered together in determining whether petitioner is an employee.

Respondent contends that the DFM exercised control, or had the right to exercise control, over petitioner to such a degree that we must conclude that he was an employee. In this regard, respondent points out that as a missionary, petitioner qualifies as a professional who required little supervision and that the absence of actual control should not be confused with an absence of the right to control.

The threshold level of control necessary to find employee status is generally lower when applied to professional services than when applied to nonprofessional services. Azad v. United States, supra at 77, Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. at 232. However, the precise degree of control required to find an employer-employee relationship varies with different occupations. United States v. W.M. Webb, Inc., 397 U.S. 179, 193 (1970). In the present case, even applying a lower standard of control because of petitioner's status as a professional, we find that neither the National Church nor the DFM exercised, or had the right to exercise, a sufficient degree of control to support a finding that petitioner was an employee.

Neither the National Church nor the DFM provided any type of professional training for petitioner. The DFM did not assign petitioner to minister in a particular country; petitioner selected Bangladesh, notwithstanding the reservations expressed

by the DFM.  The DFM did not direct petitioner to work on a particular project in Bangladesh; rather, petitioner independently chose to become involved in student ministry. Petitioner decided to expand his foreign ministry to include a drug-rehabilitation program.  He was able to make this decision without seeking permission from the DFM.  In fact, it appears that at the time of trial, the DFM was not even aware of petitioner's plans to initiate a drug-rehabilitation clinic in Bangladesh.

Petitioner determined his own work days and hours.  He was able to use his vacation and sick leave without notifying or seeking permission from the DFM.  Petitioner decided to return from his foreign ministry after only 3 years in the foreign field.  He made this decision considering the needs of his school-aged children and the schedules of the other missionaries in his area.  It appears that the DFM played little or no role in determining petitioner's field departure date.  Petitioner decided when his personal allowance would begin, and he had the power to designate the amount of his personal allowance up to the limit imposed by the DFM.

Petitioner was required to attend only one meeting every 5 years.  Apart from filing periodic disbursement, deputational, and field reports, petitioner and the DFM did not communicate regularly.  Specifically, the DFM did not contact petitioner at all during petitioner's year of deputational ministry.  Likewise,

the DFM communicated with petitioner infrequently while petitioner served in the foreign field. Petitioner was not directly supervised or evaluated by anyone.

Respondent emphasizes that the DFM maintained control over petitioner through its missions manual that dictated the manner in which petitioner was to conduct his deputational and foreign ministry. We think that respondent overstates the role of the missions manual. The missions manual was intended by the DFM to be an informational reference for missionaries, not a set of rules controlling their day-to-day conduct.

We recognize that the missions manual contains extensive information with respect to foreign ministry; however, most of the manual's provisions provide general information and guidance, rather than impose requirements on missionaries. To the extent that the missions manual appears to impose requirements on missionaries, we are reminded of Mr. Burgess' testimony that the DFM never intended to enforce the manual's provisions.

In this regard, the DFM's only method of enforcing the manual's provisions is to withdraw its endorsement of a missionary. We observe that the withdrawal of a missionary's endorsement does not prevent the missionary from serving in the foreign field; rather, it merely precludes the missionary from using DFM's services. Thus, to a substantial degree, "mandatory" provisions in the missions manual are toothless. Because the DFM intended that the missions manual be used only as a guideline,

and because the DFM lacks any real ability to enforce its provisions, we reject respondent's contention that the manual dictated the manner in which petitioner performed his missionary duties.

In summary, the DFM lacked the control and lacked the right to control the manner and means by which petitioner performed his duties as a foreign missionary. Rather, the DFM facilitates foreign ministry by processing a missionary's collections and pledges and providing useful information to missionaries through the missions manual and a proposed foreign living budget. In other words, we view the DFM as a service provider relieving endorsed missionaries from the administrative burdens of collecting and processing their pledges and obtaining information regarding their country of service.

Respondent also contends that the record in this case shows that the National Church exercised control, or had the right to exercise control, over petitioner's ministerial credentials to such a degree that we must conclude he was an employee. In support of her position, respondent points out that the National Church: (1) Maintains specific requirements for ministerial licensing and ordination; (2) has the authority to discipline ministers based on their behavior and conduct; and (3) has the authority to withdraw ministerial credentials. Specifically, respondent argues that the National Church's ability to revoke petitioner's credentials, if petitioner did not perform his

duties in the correct manner, gives the National Church the power to control his day-to-day conduct.

Respondent's emphasis on the National Church's control of petitioner's ministerial credentials is misplaced for two reasons. First, although petitioner was an ordained Assemblies of God minister, he was engaged as a missionary. The National Church's requirements for ministerial licensing and ordination, as well as its authority to discipline petitioner and withdraw his ministerial credentials, have little or no bearing as to the details and means by which petitioner performed his duties as a missionary.

Second, we do not think that the control test is satisfied where the manner in which a service is performed is controlled by the threat of the loss of professional credentials. Carried to its logical extreme, this argument would serve to classify all ordained ministers as employees of the National Church, regardless of the type of service performed. We reject respondent's contention that the National Church's ability to revoke petitioner's ministerial credentials dictated petitioner's daily conduct as a foreign missionary.

We are aware of the recent case, <u>Alford v. United States</u>, Civil No. 94-1074, in which the District Court for the Western District of Arkansas considered whether an Assemblies of God ordained minister serving as a pastor of an affiliated local church was an employee or an independent contractor. The

District Court concluded that the local church, through its supervision by the District Council and the National Church, demonstrated significant control over the manner in which the taxpayer performed his work, and therefore held that the pastor was an employee.  In so holding, the District Court emphasized the National Church's control over the taxpayer with respect to preaching, doctrine, and conduct.

We observe as an initial matter that we are not bound by the District Court's holding.  In any event, we think that petitioner's circumstances in the present case are very different from those of the taxpayer's in Alford v. United States, supra.

Petitioner was employed as a foreign missionary, not a pastor.  We think that the National Church's authority over the manner in which a pastor performs his or her duties is not highly probative in analyzing the National Church's control over the daily activities of a foreign missionary.  This is because pastoring a local church and engaging in foreign mission work are two different jobs involving different qualifications, duties, and bodies of authority.  Pastors are subject to the controls of a local church whereas missionaries are subject to the authority of the DFM.  As previously discussed, the DFM exerted very little control over petitioner.

In summary, the DFM's and National Church's lack of control over, and lack of the right to control, the manner and means by which petitioner performed his duties as a foreign missionary

support a finding that petitioner was an independent contractor, not an employee.

B.    Investment in Facilities and Equipment

Petitioner's sole compensation as a missionary was in the form of a "personal allowance" secured from funds that he raised during his deputational ministry.  In this regard, we observe that if a donor fails to remit a pledged amount, the DFM makes no effort to contact the donor, much less obtain the donation. Additionally, the National Church does not guarantee missionaries minimum compensation or support.  Petitioner used his personal car and telephone to raise funds during his deputational ministry.  Petitioner occasionally hired assistants at his own discretion and accepted responsibility for paying those assistants.

Respondent contends that petitioner was reimbursed for his expenses when he withheld costs from the offerings remitted to the DFM.  Even if petitioner were regarded as receiving reimbursement for his expenses, this matter is more than outweighed by other evidence probative of his being an independent contractor, e.g., petitioner's efforts in securing the funding for his foreign ministry and his investment in his automobile and telephone.  Thus, this factor supports a finding that petitioner was an independent contractor, not an employee.

C.   Opportunity For Profit or Loss

The National Church does not guarantee missionaries minimum compensation.  The compensation received by missionaries is in the form of a personal allowance, the amount of which depends, in part, on the total amount of funding that missionaries are able to secure during their deputational ministry.  Additionally, upon resignation, missionaries forfeit any account balance they may have with the DFM and must reallocate their funds to another ministry.

Because petitioner had some opportunity for profit and risk of loss, this factor supports a finding that petitioner was an independent contractor, not an employee.

D.   Permanency of the Relationship

Petitioner concedes that missionary ministry is a lifetime career.  This factor supports a finding that petitioner was an employee.

E.   DFM's Right of Discharge

The DFM did not have the power to prevent petitioner from serving as an Assemblies of God missionary in Bangladesh.  The DFM's most extreme form of discipline is the withdrawal of a missionary's endorsement.  For a missionary, the practical consequence of losing the DFM's endorsement is one of administrative inconvenience, namely, that the missionary must collect and process pledges without the assistance of the DFM.

In any event, unendorsed Assemblies of God missionaries can and do serve in the foreign field.

Respondent contends that because petitioner is an Assemblies of God minister, the General and District Councils have the right to revoke petitioner's ministerial credentials, and that, therefore, the National Church can effectively discharge petitioner. Indeed, the credentials committee has the authority to withdraw the approval and recommend the recall of ministerial credentials. Although petitioner is an Assemblies of God minister subject to the disciplinary proceedings in the constitution and bylaws, he presently serves in the capacity of a foreign missionary. Thus, we think the more appropriate analysis considers the DFM's right to discharge petitioner in his capacity as a missionary, rather than the National Church's right to recall petitioner's ministerial credentials.

Because the DFM lacked the power to discharge petitioner as a missionary to Bangladesh, this factor supports a finding that petitioner was an independent contractor, and not an employee.

F.   Integral Part of Business

The DFM's primary mission is world evangelism. Petitioner's work as an Assemblies of God missionary was directly related to the accomplishment of that mission. This factor supports a finding that petitioner was an employee.

G.   Relationship Petitioner and DFM Believed They Had Created

Jerry Burgess, who had worked as the financial comptroller of the DFM for 16 years, testified that the DFM considered its missionaries independent contractors, not employees.  Mr. Burgess' testimony is supported by the fact that the National Church issued petitioner Form 1099-MISC reflecting nonemployee compensation for services rendered.  Additionally, the fact that Federal income tax was not withheld from petitioner's compensation is consistent with the DFM's view that petitioner was an independent contractor.

Petitioner also thought he was an independent contractor, as evidenced by the fact that he reported his foreign ministry receipts and expenses on Schedule C.

Because the National Church and petitioner thought that petitioner was an independent contractor, this factor would support a finding that petitioner was an independent contractor, not an employee.

H.   Employee-Type Benefits

The DFM offered petitioner access to the MBA pension plan and a health insurance plan.  Petitioner participated in the MBA pension plan and the health insurance plan.  The premiums for petitioner's health insurance and the money transferred into petitioner's MBA account were paid directly from petitioner's account with the DFM.

The DFM has no policy regarding sick leave and does not maintain records reflecting either vacation or sick leave taken by missionaries. Missionaries continue to receive their personal allowances while on vacation and sick leave.

Although the matter is not free from doubt, we think that these facts support a finding that petitioner was an employee, not an independent contractor.

I. Conclusion

Some aspects of the relationship between petitioner and the National Church indicate that petitioner was an employee, whereas other aspects of the relationship indicate that he was an independent contractor. After weighing the above factors, giving particular weight to the lack of control and the lack of the right to control that the National Church and the DFM had over endorsed missionaries, we conclude that petitioner was an independent contractor, and not an employee, in 1992.

Because of our determination that petitioner was an independent contractor for purposes of section 62(a), petitioner's trade or business expenses are deductible "above the line" on Schedule C and need not be relegated to Schedule A.

- NEXTRECORD -

To reflect our conclusion herein,

Decision will be entered

for petitioners.