T.C. Memo. 2013-161

UNITED STATES TAX COURT

KADIMAH CHAPTER KIRYAT UNGVAR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27494-11.                    Filed July 1, 2013.

Kenneth H. Silverberg and Jason Gonzalez, for petitioner.

Linda P. Azmon, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, Judge:  Respondent issued a notice of determination of worker classification regarding petitioner's liabilities under the Federal Insurance Contribution Act (FICA) and petitioner's income tax withholding (ITW) imposed by sections 3401 through 3406 for the last three quarters of tax year 2004 and all

[*2] quarters in tax years 2005, 2006, and 2007 (taxable periods at issue).

Respondent reclassified four persons--Marcel Gross, Avrohom Zachariash,[1] Mark Knopfler, and Myron Schwartz--as petitioner's employees for the taxable periods at issue and determined deficiencies with respect to petitioner's Federal employment taxes as follows:

| Tax period ended | Type of tax | Amount |
| --- | --- | --- |
| 6/30/04 | FICA | $39,100 |
| 6/30/04 | ITW | 63,888 |
| 9/30/04 | FICA | 3,380 |
| 9/30/04 | ITW | 10,500 |
| 12/31/04 | FICA | 4,688 |
| 12/31/04 | ITW | 16,126 |
| 3/31/05 | FICA | 4,284 |
| 3/31/05 | ITW | 7,000 |
| 6/30/05 | FICA | 5,355 |
| 6/30/05 | ITW | 8,750 |
| 9/30/05 | FICA | 2,295 |
| 9/30/05 | ITW | 3,750 |
| 12/31/05 | FICA | 2,068 |
| 12/31/05 | ITW | 5,000 |

---

[1]We note that the stipulation of facts lists Mr. Zachariash's first name as Avrohom while the transcript of record lists it as Abraham.

| | | |
|---|---|---|
| [*3] 3/31/06 | FICA | 2,295 |
| 3/31/06 | ITW | 3,750 |
| 6/30/06 | FICA | 2,907 |
| 6/30/06 | ITW | 4,750 |
| 9/30/06 | FICA | 3,060 |
| 9/30/06 | ITW | 5,000 |
| 12/31/06 | FICA | 5,814 |
| 12/31/06 | ITW | 9,500 |
| 3/31/07 | FICA | 3,978 |
| 3/31/07 | ITW | 4,977 |
| 6/30/07 | FICA | 3,443 |
| 6/30/07 | ITW | 4,2612 |
| 9/30/07 | FICA | 8,798 |
| 9/30/07 | ITW | 10,543 |
| 12/31/07 | FICA | 3,443 |
| 12/31/07 | ITW | 3,990 |

Respondent also determined that petitioner was liable for additions to tax under section 6651(a)(1) and (2) and penalties under section 6656 as follows:

| | Additions to tax | | |
|---|---|---|---|
| Year | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
| 2004 | $30,978 | $34,420 | $2,358 |
| 2005 | 8,663 | 9,626 | 700 |

| [*4] 2006 | 8,342 | 9,192 | 704 |
| 2007 | 11,652 | 10,671 | 983 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable periods at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

The parties have reached a settlement to legally classify Messrs. Gross, Zachariash, and Knopfler as petitioner's employees for the taxable periods at issue.  The parties have deemed that some of the amounts paid to Messrs. Gross, Zachariash, and Knopfler are wages, and the parties have agreed that petitioner is liable for tax under FICA and for ITW with respect to those wages.  The parties have also agreed that petitioner is liable for additions to tax under section 6651(a)(1) and penalties under section 6656 with respect to those wages.

Respondent has conceded that petitioner is not liable for additions to tax pursuant to section 6651(a)(2) with respect to wages paid to all four workers, including Mr. Schwartz.

The issues remaining for consideration are the following:  (1) whether Mr. Schwartz should be legally classified as petitioner's employee for the taxable periods at issue; (2) whether petitioner is entitled to relief under the Revenue Act

[*5] of 1978, Pub. L. No. 95-600, sec. 530, 92 Stat. at 2885, as amended (section 530), which deems an individual not to be an employee in certain circumstances, with respect to Mr. Schwartz; (3) whether petitioner is liable for additions to tax under section 6651(a)(1) with respect to wages paid to Mr. Schwartz; and (4) whether petitioner is liable for penalties under section 6656 with respect to wages paid to Mr. Schwartz.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. Petitioner, a corporation exempt from Federal taxation pursuant to section 501(c)(3), had its principal place of business in New York at all relevant times.

Petitioner's Incorporation

Petitioner was incorporated in New York on November 2, 1992, under article 10 of the Religious Corporations Law of New York.

According to petitioner's certificate of incorporation, petitioner was organized to maintain a house of worship with a principal place of worship in Brooklyn, New York. The certificate of incorporation states that petitioner was "organized exclusively for one or more of the * * * purposes * * * specified in Sec. 501(c)(3) of the Internal Revenue Code of 1954, and shall not carry on any activities not permitted to be carried on by a corporation exempt from Federal

[*6] income tax under Sec. 501(c)(3) of the Internal Revenue Code of 1954". The certificate of incorporation further states that "no part of * * * [petitioner's] net earnings * * * shall inure to the benefit of any member, trustee, director, officer of the corporation, or any private shareholder (except that reasonable compensation may be paid for services rendered to or for the corporation) and no member, trustee, or officer shall be entitled to share in the distribution of any of the corporate assets upon dissolution of the corporation."

Petitioner's original board of directors and trustees (board) included Mr. Schwartz and Mr. Knopfler. Mr. Knopfler, who served as trustee director, was trained as a certified public accountant. Mr. Schwartz resigned from his position on the board in January 1998. Upon Mr. Schwartz's resignation, Messrs. Gross and Zachariash joined Mr. Knopfler as members of the board. Mr. Gross earned a bachelor's degree in accounting and ran his own accounting firm, which had other exempt organizations as clients. Messrs. Gross, Zachariash, and Knopfler remained on the board during the taxable periods at issue. Mr. Knopfler died in 2010.

Since incorporation petitioner has never filed any Federal income tax returns, including Forms 1120, U.S. Corporation Income Tax Return, and Forms 990, Return of Organization Exempt From Income Tax. Likewise, petitioner has

[*7] never filed any Federal employment tax returns, including Forms 941, Employer's Quarterly Federal Tax Return; Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return; and Forms 945, Annual Return of Withheld Federal Income Tax.

Rabbi Bernard J. Schwartz

Rabbi Schwartz was born in 1914. His son, Mr. Schwartz, was born in 1951. From 1965 through 1990 Rabbi Schwartz was the rabbi at Temple Kadimah, an independent Jewish congregation unaffiliated with any other synagogue. Temple Kadimah was located in a three-story building in Brooklyn, New York. Rabbi Schwartz owned the building until 1993. While Rabbi Schwartz was at Temple Kadimah, the first floor of the building operated as a synagogue, the second floor operated as a Hebrew school, and the third floor operated as a residence for Rabbi Schwartz, his wife, and Mr. Schwartz.

In 1990 Rabbi Schwartz retired from Temple Kadimah. He was not employed as a rabbi by any organization after his retirement. Before he retired, Rabbi Schwartz arranged for the funds in Temple Kadimah's bank account to be transferred to a bank account in petitioner's name. Rabbi Schwartz was never affiliated with petitioner. He never provided services to petitioner, he was never a member of petitioner's board, and he never possessed signatory authority over any

[*8] of petitioner's bank accounts.  Rabbi Schwartz died in October 2005.  Mr. Schwartz died in January 2010.

Rabbi Menashe Klein

Rabbi Klein was well known in petitioner's community and abroad.  He was a member of the Jewish Decisers and received questions throughout the world about Jewish law and custom.  Rabbi Klein presided over Khal Ungvar, an incorporated congregation and synagogue legally distinct from petitioner.  At all relevant times Khal Ungvar was exempt from Federal income tax pursuant to section 501(c)(3), and its principal place for the conduct and operation of religious services and business operations was in Brooklyn, New York.

Khal Ungvar's constitution and bylaws state that "[t]he objectives of Khal Ungvar shall be exclusively religious, charitable and educationable within the meaning of section 501(c)(3)" and that "the function of Khal Ungvar will be to serve as a synagouge [sic]."  Additionally, Khal Ungvar's constitution and bylaws state that Khal Ungvar may exercise the power, among other things, "[t]o solicit, accept, receive, hold and administer funds exclusively for * * * [Khal Ungvar's stated objectives] and to that end, to take and receive by bequest, devise, gift or benefit of trust (but not as trustee of any trust)".  Finally, Khal Ungvar's constitution and bylaws state that "Khal Ungvar shall not be conducted or

[*9] operated for profit and no part of the net earnings of Khal Ungvar shall inure to the benefit of any member or individual" and that "no part of the net earnings, property or assets of Khal Ungvar shall be used other than for * * * [Khal Ungvar's stated objectives]."

Messrs. Gross, Zachariash, and Knopfler all had close relationships with Rabbi Klein. Mr. Gross was one of Rabbi Klein's former students. They had a close business and familial relationship; they spoke at least once a week. Mr. Zachariash was Rabbi Klein's secretary. He has worked at Khal Ungvar for over 20 years.[2] Mr. Zachariash compared his experience with Rabbi Klein to that of the Papal secretary. Mr. Knopfler was one of Rabbi Klein's former students as well as his close disciple and adviser.

Rabbi Klein was never affiliated with petitioner. He never provided services to petitioner, he was never a member of petitioner's board, and he never possessed signatory authority over any of petitioner's bank accounts. Rabbi Klein died in 2011.

---

[2]At trial Mr. Zachariash testified that he worked for Kiryat Ungvar, an Israeli nonprofit organization legally distinct from petitioner, but the rest of the record, including the stipulation of facts, indicates that he worked for Khal Ungvar.

**[*10]** <u>The Kings Point Residence</u>

On November 19, 1992, petitioner purchased a residence in Kings Point, New York (Kings Point residence). Mr. Schwartz found the Kings Point residence for petitioner. Before the purchase Mr. Schwartz retained a real estate appraiser who prepared a comparative sales analysis for him. Petitioner did not obtain a mortgage or any type of loan to purchase the Kings Point residence, which had a tennis court and a swimming pool. Soon after the purchase petitioner agreed to lease the Kings Point residence to "the family of Rabbi Bernard J. Schwartz", which included Rabbi Schwartz's wife and Mr. Schwartz, for a nominal fee on a month-to-month basis.

Mr. Schwartz was responsible for maintaining the premises and property of the Kings Point residence. He managed the property, landscaped, maintained the pool, removed snow, made repairs, maintained the property's heating and air conditioning, and performed other general maintenance services. The bills related to the Kings Point residence were in petitioner's name. Mr. Schwartz paid those bills on petitioner's behalf with money from petitioner's bank accounts.

Mr. Schwartz maintained homeowners insurance for the Kings Point residence in his name from 1994 through 2004. During that time petitioner did not maintain insurance coverage for the Kings Point residence in its own name. In

**[*11]** October 1999 Mr. Schwartz applied for homeowners insurance with Royal & Sunalliance. On the application for insurance Mr. Schwartz listed himself as the owner and "T Kadimah Chapter" as a mortgage interest holder. "T Kadimah Chapter" did not hold a mortgage interest in the Kings Point residence at that time.

In 2000 Mr. Schwartz (as "Rev. M. Jay Schwartz") filed a Form RP-462, Application for Exemption From Real Property Taxes for Property Used as Residence of Officiating Clergy ("Parsonage" or "Manse"), with the New York State Department of Taxation and Finance for the Kings Point residence. On the application, under "name of religious corporation", Mr. Schwartz wrote petitioner's name. In 2002 Rabbi Joel Weiss, in his capacity as a member of petitioner's board, filed a Form RP-420-a/b-Rnw-II, Renewal Application for Real Property Tax Exemption for Nonprofit Organizations II--Property Use, with the New York State Department of Taxation and Finance for the Kings Point residence.

In 2003 Rabbi Schwartz moved to a nursing home, and Mr. Schwartz moved to a new address. By that time, Rabbi Schwartz's wife had passed away. Mr. Schwartz continued to visit the Kings Point residence approximately three days per week, using the pool during the summer and sleeping there at least one night per week, through June 2004.

**[*12]** Sale of the Kings Point Residence

At a time not specified in the record, Mr. Schwartz discussed the sale of the Kings Point residence with Messrs. Gross and Knopfler. Mr. Schwartz then found a buyer for the Kings Point residence. He also retained an appraiser and an attorney to aid petitioner with the sale.

On January 6, 2003, petitioner entered into a contract to sell the Kings Point residence. That same day members of petitioner's board authorized the sale, memorializing their unanimous consent in a document (unanimous written consent). The board's unanimous written consent stated that (1) petitioner no longer maintained a viable congregation; (2) petitioner was affiliated with Khal Ungvar, an active Jewish congregation incorporated under the Religious Corporations Law of New York and exempt from Federal taxation pursuant to section 501(c)(3); and (3) the proceeds from the sale of the Kings Point residence should be distributed to Khal Ungvar.

Because petitioner is a religious corporation, the sale had to be approved by the attorney general of New York. Mr. Schwartz retained an attorney on petitioner's behalf to aid petitioner with a petition for approval of sale. In its petition for approval of sale petitioner requested leave to sell the Kings Point residence, petitioner's sole asset. Petitioner stated that it was contemplating

[*13] dissolution after the sale and requested that it be allowed to distribute the sale proceeds to Khal Ungvar. Petitioner further claimed that it operated as a chapter of Khal Ungvar. On April 1, 2004, petitioner was granted leave to sell the Kings Point residence. The order granting leave to sell required that petitioner distribute the sale proceeds to Khal Ungvar upon petitioner's dissolution. On June 3, 2004, the sale of the Kings Point residence closed.

Petitioner did not dissolve after the sale. At a time not specified in the record, Messrs. Gross, Zachariash, and Knopfler agreed orally that petitioner would place the proceeds from the sale of the Kings Point residence into its own bank account. They also agreed that petitioner would pay Mr. Schwartz a monthly stipend of approximately $5,000 per month. Messrs. Gross, Zachariash, and Knopfler did not reduce this agreement to writing.

On June 14, 2004, petitioner deposited the sale proceeds into its bank account. On September 27, 2004, petitioner began to write checks to Mr. Schwartz. On December 10, 2004, Messrs. Knopfler and Zachariash authorized Smith Barney to establish automatic fund transfers from petitioner's bank account to Mr. Schwartz's personal bank account. On April 21, 2006, Messrs. Gross, Zachariash, and Knopfler notified Smith Barney that they wished to temporarily suspend the automatic fund transfers and to send Mr. Schwartz a monthly

[*14] distribution of $5,000. Petitioner continued to write checks and transfer funds to Mr. Schwartz through December 27, 2007.

For tax year 2004 petitioner made the following payments to Mr. Schwartz:

| Date | Amount |
|------|--------|
| 9/27 | $5,000 |
| 9/27 | 7,000 |
| 10/8 | 5,000 |
| 12/2 | 5,000 |
| 12/2 | 5,000 |
| 12/22 | 5,000 |
| Total | 32,000 |

For tax year 2005 petitioner made the following payments to Mr. Schwartz:

| Date | Amount |
|------|--------|
| 1/27 | $5,000 |
| 2/16 | 2,500 |
| 2/28 | 5,000 |
| 3/2 | 7,500 |
| 3/28 | 5,000 |
| 3/30 | 3,000 |
| 4/27 | 5,000 |
| 5/6 | 5,000 |
| 5/27 | 5,000 |

| | |
|---|---|
| [*15] 5/27 | 7,000 |
| 6/2 | 8,000 |
| 6/27 | 5,000 |
| 7/27 | 5,000 |
| 8/29 | 5,000 |
| 9/27 | 5,000 |
| 10/27 | 5,000 |
| 10/28 | 5,000 |
| 11/28 | 5,000 |
| 12/27 | 5,000 |
| Total | 98,000 |

For tax year 2006 petitioner made the following payments to Mr. Schwartz:

| Date | Amount |
|---|---|
| 1/27 | $5,000 |
| 2/27 | 5,000 |
| 3/27 | 5,000 |
| 4/27 | 5,000 |
| 5/26 | 5,000 |
| 6/27 | 5,000 |
| 7/28 | 5,000 |
| 8/2 | 5,000 |
| 8/28 | 5,000 |
| 9/27 | 5,000 |

| | |
|---|---|
| **[*16]** 10/27 | 6,000 |
| 11/2 | 10,000 |
| 11/27 | 6,000 |
| 12/27 | 6,000 |
| 12/29 | <u>10,000</u> |
| Total | 88,000 |

Finally, for tax year 2007 petitioner made the following payments to Mr. Schwartz:

| Date | Amount |
|---|---|
| 1/29 | $6,000 |
| 2/9 | 5,000 |
| 2/27 | 7,500 |
| 3/27 | 7,500 |
| 4/27 | 7,500 |
| 5/29 | 7,500 |
| 6/27 | 7,500 |
| 7/27 | 7,500 |
| 8/27 | 7,500 |
| 9/27 | 7,500 |
| 10/29 | 7,500 |

|  |  |
|---|---|
| [*17] 11/27 | 7,500 |
| 12/27 | 7,500 |
| Total | 93,500 |

Petitioner paid Mr. Schwartz a total of $311,500 during the taxable periods at issue. Petitioner did not file Forms W-2, Wage and Tax Statement, or Forms 1099-MISC, Miscellaneous Income, with respect to any of these payments.

The Fire at the Kings Point Residence

On January 17, 2004--after petitioner entered into a contract to sell the Kings Point residence, but before petitioner was granted leave to sell it--a fire occurred at the Kings Point residence. Mr. Schwartz retained an appraiser to ascertain the extent of the damage caused by the fire. Mr. Schwartz filed a claim with Royal & Sunalliance seeking payment for the damage to the Kings Point residence from the fire. Royal & Sunalliance denied Mr. Schwartz's claim on the grounds that he made fraudulent statements and material misrepresentations on his application for insurance.

On February 9, 2005, Mr. Schwartz filed suit in his individual capacity and on behalf of petitioner against Royal & Sunalliance and Royal Indemnity Co. in the Supreme Court of New York. Mr. Schwartz also filed suit in his individual capacity and on behalf of petitioner against Fairmont Insurance Brokers, Ltd., in

**[\*18]** the Supreme Court of New York.  The outcomes of those cases are not relevant to this opinion.

OPINION

I.     Legal Classification of Mr. Schwartz

A.     Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and a taxpayer bears the burden of proving those determinations are erroneous.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). This principle applies to the Commissioner's determination that a taxpayer's workers are employees.  Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 268 (2001).  If an employer-employee relationship exists, its characterization by the parties as some other relationship is immaterial.  Sec. 31.3121(d)-1(a)(3), Employment Tax Regs.  Section 7491(a)(1), which shifts the burden of proof to the Secretary in certain other circumstances, does not apply to employment tax disputes.  Sec. 7491(a)(1); see also Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. 89, 102 (2003), aff'd, 425 F.3d 1203 (9th Cir. 2005); Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 123 n.2 (2002), aff'd, 93 Fed. Appx. 473 (3d Cir. 2004).  Therefore, petitioner bears the

[*19] burden of proving that Mr. Schwartz was not its employee during the taxable periods at issue.

### B. Mr. Schwartz as Petitioner's Employee

Petitioner contends that the payments made to Mr. Schwartz were pursuant to a trust that Rabbi Schwartz created for Mr. Schwartz's benefit, rather than wage payments to an employee or an independent contractor. We have determined that this case can be decided on whether Mr. Schwartz can be classified as an employee of petitioner. Therefore, we will not address the issue of whether a trust was created.[3]

Employers and employees are subject to "employment taxes", including FICA. FICA provides a Social Security tax payable by both employers and employees. See secs. 3101, 3111. Employers are required to withhold FICA tax and Federal income tax on wage payments (i.e., ITW) that they make to their employees. See secs. 3102, 3402. These employment taxes do not apply to payments made to independent contractors.

Petitioner contends that Mr. Schwartz was not its employee and that Mr. Schwartz's actions were consistent with those of a homeowner rather than

---

[3]Even though we will not discuss the issue of whether a trust was created, we found it disconcerting that the testimony petitioner's witnesses presented did not support a requisite intent to create a trust, among other things.

[*20] petitioner's worker.  Respondent contends that Mr. Schwartz was petitioner's property manager and that many of Mr. Schwartz actions with respect to the Kings Point residence were performed on petitioner's behalf using petitioner's funds.  Respondent further contends that petitioner benefited from Mr. Schwartz's actions, which respondent claims were done in connection with petitioner's business of owning and maintaining a parsonage for Rabbi Schwartz during his retirement.

The facts in this case and those of typical worker classification controversies are strikingly dissimilar.  See, e.g., Kurek v. Commissioner, T.C. Memo. 2013-64 (holding that the taxpayer, the sole proprietor of a construction company, failed to properly classify as employees the workers he hired to help him complete construction projects); Specks v. Commissioner, T.C. Memo. 2012-343 (holding that the taxpayer husband, who provided security services to several companies as a second job and was paid weekly by the companies, properly classified himself as an independent contractor); Blodgett v. Commissioner, T.C. Memo. 2012-298 (holding that the taxpayer husband, who served on the board of trustees of a local bank for nearly 30 years and was issued a Form 1099-MISC for the wage payments he received from the bank, was properly classified as an independent contractor); Atl. Coast Masonry, Inc. v. Commissioner, T.C. Memo.

[*21] 2012-233 (holding that the taxpayer failed to properly classify its corporate officers, masons, and laborers as employees); Twin Rivers Farm, Inc. v. Commissioner, T.C. Memo. 2012-184 (holding that the taxpayer, who hired two men to work on its farm, failed to properly classify the workers as employees; the taxpayer purchased workers' compensation and employer's liability insurance, paid the workers weekly, and provided living quarters to the workers rent free). Among other things, unlike in a typical worker classification controversy, petitioner did not make payments to Mr. Schwartz while he was maintaining the Kings Point residence;[4] rather, petitioner made large payments to Mr. Schwartz over the course of four years following the sale of the Kings Point residence.[5]

---

[4]The record implies that Mr. Schwartz may have maintained the Kings Point residence in exchange for living at the Kings Point residence rent free before 2003, when Mr. Schwartz moved to a new home. Taxable periods before 2004, however, are beyond the scope of this case.

[5]Pursuant to secs. 31.3121(a)-1(i) and 31.3401(a)-1(a)(5), Employment Tax Regs., remuneration for employment may constitute wages even if the employer-employee relationship no longer existed at the time of the remuneration between the person in whose employ the services were performed and the individual who performed them. Although the regulations themselves do not offer a limitation on the amount of time that may pass between the end of the employment relationship and the payment before the payment made is no longer remuneration, the regulations provide an example of a gap of two weeks between employment and payment. Secs. 31.3121(a)-1(i), Example, 31.3401(a)-(1)(a)(5), Example, Employment Tax Regs.

**[\*22]** Whether an individual performing services for a principal is an employee (rather than an independent contractor) is a factual question to which common law principles apply. Weber v. Commissioner, 103 T.C. 378, 386 (1994), aff'd per curiam, 60 F.3d 1104 (4th Cir. 1995); see secs. 3121(d)(2), 3306(i). In determining whether a worker is an employee, the Court considers (1) the degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used by the worker; (3) the opportunity of the worker for profit or loss; (4) whether the principal can discharge the worker; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believed they were creating. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270; Weber v. Commissioner, 103 T.C. at 387. We consider all facts and circumstances; no one factor dictates the outcome. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270. Although the determination of employee status is to be made by common law concepts, a realistic interpretation of the term "employee" should be adopted, and doubtful questions should be resolved in favor of employment in order to accomplish the remedial purposes of the legislation involved. Id. at 269 (citing Breaux & Daigle, Inc. v. United States, 900 F.2d 49, 52 (5th Cir. 1990)); see also Twin Rivers Farm, Inc. v. Commissioner, slip op. at 6-7.

[*23]     1.     <u>Degree of Control</u>

The right of the principal to exercise control over the agent, whether or not the principal in fact does so, is the "crucial test" for the existence of an employer-employee relationship.  <u>Weber v. Commissioner</u>, 103 T.C. at 387; <u>see also</u> <u>Atl. Coast Masonry, Inc. v. Commissioner</u>, at *15.  Under common law, an employer-employee relationship exists when the principal has the right to control and direct the worker regarding the result and how the result is accomplished.  Secs. 31.3121(d)-1(c)(2), 31.3401(c)-1(b), Employment Tax Regs.  The principal need not actually direct or control the manner in which the services are performed; the principal need only have the right to do so.  See <u>Weber v. Commissioner</u>, 103 T.C. at 388; <u>Twin Rivers Farm, Inc. v. Commissioner</u>, slip op. at 7.  Similarly, the principal need not set the worker's hours or supervise every detail of the work environment to control the worker.  <u>Ewens & Miller, Inc. v. Commissioner</u>, 117 T.C. at 270 (citing <u>Gen. Inv. Corp. v. United States</u>, 823 F.2d 337, 342 (9th Cir. 1987)).  Workers who set their own hours are not necessarily independent contractors.  <u>Id.</u>

There is no indication in the record that petitioner maintained any control over Mr. Schwartz or could have directed or controlled Mr. Schwartz.  Indeed, there is no indication that Mr. Schwartz reported to petitioner or that petitioner

[*24] maintained any oversight over Mr. Schwartz's efforts or evaluated his work. This factor weighs against classifying Mr. Schwartz as petitioner's employee.

### 2. Investment in Facilities

Unlike in a typical worker classification case, Mr. Schwartz was the tenant of the Kings Point residence, where respondent alleges most of Mr. Schwartz's services took place. However, the Kings Point residence was sold on June 3, 2004. Therefore, there were no facilities or equipment in which petitioner invested for most of the taxable periods at issue. This factor is neutral.

### 3. Opportunity for Profit and Risk of Loss

The opportunity for profit or loss indicates nonemployee status. See Simpson v. Commissioner, 64 T.C. 974, 988 (1975); see also Twin Rivers Farm, Inc. v. Commissioner, slip op. at 9. The fact that a worker is insulated from suffering a loss or prevented from realizing profit generally indicates that the worker is an employee. See Kurek v. Commissioner, at *12; Atl. Coast Masonry, Inc. v. Commissioner, at *16. As the sole owner of the Kings Point residence, petitioner generally had the opportunity for profit and bore the risk of loss from the sale of the Kings Point residence. However, the Kings Point residence was sold in June 2004. We note, though, that petitioner was not engaged in any

[*25] apparent trade or business during most of the taxable periods at issue. This factor weighs against classifying Mr. Schwartz as petitioner's employee.

### 4. Right To Discharge the Workers

Employers typically have the right to terminate employees at will. Ellison v. Commissioner, 55 T.C. 142, 155 (1970); Kurek v. Commissioner, at *12. Unlike a normal employer-employee situation, petitioner would not have been able to terminate Mr. Schwartz. As the tenant of the Kings Point residence, Mr. Schwartz would have had the right to continue to maintain the property. Had petitioner wished to prevent Mr. Schwartz from maintaining the property, petitioner likely would have had to evict Mr. Schwartz. Furthermore, we note that for most of the taxable periods at issue, petitioner no longer owned the Kings Point residence. This factor weighs against classifying Mr. Schwartz as petitioner's employee.

### 5. Integral Part of the Business

Employees are typically an essential part of a taxpayer's normal operation. Kurek v. Commissioner, at *12; see Atl. Coast Masonry, Inc. v. Commissioner, at *18. Petitioner's sole asset was the Kings Point residence until the sale, after which its sole asset was the proceeds. Although petitioner claimed in its certificate of incorporation that it was organized to maintain a house of worship, with a

[*26] principal place of worship in Brooklyn, New York, the record reflects that petitioner never operated the Kings Point residence (or any other building) as a house of worship and that petitioner has never had a congregation. Instead, the record reflects that petitioner owned and maintained the Kings Point residence as a parsonage for Rabbi Schwartz and his family.

Petitioner did not maintain a business for the purposes of this factor test. This factor is neutral.

### 6. Permanency of the Relationship

The permanency of a work relationship indicates employee status. See Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 273 (noting that a transitory work relationship may point toward independent contractor status); see also Twin Rivers Farm, Inc. v. Commissioner, slip op. at 11. Mr. Schwartz's relationship with petitioner began when he was a member of petitioner's original board. This relationship ended when Mr. Schwartz resigned from his position in 1998, several years before the taxable periods at issue. This factor weighs against classifying Mr. Schwartz as petitioner's employee.

**[*27]**        7.        <u>The Relationship the Parties Believed They Created</u>

Petitioner contends that the relationship created by the parties was not intended to be that of an employer-employee. Petitioner contends that they created a relationship in which petitioner supported Mr. Schwartz.

At trial Mr. Gross testified that he believed that Rabbi Klein promised Rabbi Schwartz that he, Rabbi Klein, would take care of Mr. Schwartz with petitioner's funds. Specifically, Mr. Gross testified that "[Rabbi] Bernard Schwartz had an only child, Myron, and the funds were considerable and he didn't find a way that this son is going to be able to support himself.[6] And it was my understanding that Rabbi Klein promised [Rabbi] Bernard Schwartz that he would take care of his son from these funds." Mr. Gross was not present when Rabbi Schwartz and Rabbi Klein made this claimed agreement. When asked whether he discussed the claimed agreement with Rabbi Klein, Mr. Gross stated: "I don't know that we discussed it. We had that common understanding. We worked together, you know. * * * We discussed the Schwartzes, we discussed the house that was sold. We discussed that Myron is, you know, knocking on our door wanting to know--how do we support the guy? So this is what we did."

---

[6]Petitioner alleges that Mr. Schwartz's weight left him unfit for employment; however, petitioner acknowledges that Mr. Schwartz worked periodically as a limo driver.

[*28] Despite the contradictions in Mr. Gross' testimony, the consistent thread is that petitioner believed its duty was to support Mr. Schwartz. Although the existence of this duty was highly questionable given petitioner's exempt status, we find that petitioner did not believe it had an employer-employee relationship with Mr. Schwartz. This factor weighs against classifying Mr. Schwartz as petitioner's employee.

### 8. Conclusion

After weighing the above factors, we conclude that Mr. Schwartz was not petitioner's employee during the taxable periods at issue. It appears that respondent was trying to fit a square peg into a round hole by arguing Mr. Schwartz was an employee.

## II. Additions to Tax and Penalties Under Sections 6651(a)(1) and 6656

Petitioner was not required to file any Federal employment tax returns or make any required deposits for the taxable periods at issue with respect to Mr. Schwartz because Mr. Schwartz was not petitioner's employee during that time. Accordingly, we hold that petitioner is not liable for additions to tax pursuant to section 6651(a)(1) or for penalties under section 6656 for the taxable periods at issue.

**[*29]** III.    <u>Conclusion</u>

We hold that Mr. Schwartz was not petitioner's employee for the taxable periods at issue and that petitioner is not liable for Federal employment taxes with respect to Mr. Schwartz as determined by respondent.  Because Mr. Schwartz was not petitioner's employee, section 530 relief is not applicable.  We further hold that petitioner is not liable for additions to tax pursuant to section 6651(a)(1) or penalties pursuant to section 6656 for the taxable periods at issue with respect to Mr. Schwartz.  Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing and respondent's concessions,

<u>An appropriate decision</u>

<u>will be entered</u>.